Stephen B. ELLIS, Plaintiff,

v.

**Samuel SKINNER, in his official capacity as the Secretary, United States Department of Transportation; Robert E. Farris, in his official capacity as the Deputy Administrator, Federal Highway Administration, United States Department of Transportation; Louis N. MacDonald, in his official capacity as the Regional Administrator, Federal Highway Administration; Eugene Findlay, individually and in his official capacity as Director of the Utah Department of Transportation, and Mario Blanco, individually and in his official capacity as Civil Rights Coordinator, Utah Department of Transportation, Defendants.**

No. 87–C–0616G.

United States District Court,
D. Utah, C.D.

Oct. 15, 1990.

---

James B. Lee, Salt Lake City, Utah, William Perry Pendley, Gary N. Herbert, Mountain States Legal Foundation, Denver, Colo., for plaintiff.

Leland D. Ford, Richard S. Ugelow, U.S. Dept. of Justice, Washington, D.C., Miguel R. Rovira, Alexandria, Va., for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This case involves a challenge to the constitutionality of the federal Disadvantaged Business Enterprise ("DBE") program as applied in Utah. Presently pending are cross motions for summary judgment under a Joint Stipulation of Facts.[1]

Plaintiff, Stephen Ellis, a white male landscape contractor, seeks a declaratory judgment and permanent injunction against officials of the federal Department of Transportation ("DOT") and the Utah Department of Transportation ("UDOT") on the ground that the federal DBE program as applied by the State of Utah is unconstitutional under the equal protection clause of the Fourteenth Amendment of the United States Constitution. Defendants' Motion for Summary Judgment seeks a ruling that the federal DBE program and Utah's plan participating in that program are constitutional in all respects.[2] For purposes of the cross motions for summary judgment, the parties have stipulated that the federal statutes and implementing regulations are facially lawful and constitutional.[3]

## BACKGROUND

The federal program for socially and economically disadvantaged business enterprises was promulgated by Congress under Section 105(f) of the Surface Transporta-

---

**1.** On August 18, 1988, plaintiff previously filed a motion for summary judgment challenging the constitutionality of the Utah DBE program both on its face and as applied. However, consideration of that motion was deferred pending the Supreme Court's decision in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). After the *Croson* decision, the pending cross summary judgment motions were filed.

**2.** The federal defendants, *i.e.* defendants Skinner, Farris, and MacDonald, submitted briefs in connection with their Motion for Summary

Judgment. The state defendants, *i.e.* defendants Findlay and Blanco, simply joined in the federal defendants' Motion.

**3.** In his Complaint, plaintiff challenges the federal DBE program both on its face and as it has been applied by the State of Utah. The Complaint claims that the DBE program as administered by both federal and state authorities has violated plaintiff's due process and equal protection rights guaranteed by the Fifth Amendment, the equal protection clause of the Fourteenth Amendment, 42 U.S.C. §§ 1983, 2000d, and Article I section 2 of the Utah Constitution.

tion Assistance Act of 1982 ("STAA"), and section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"). As a condition to receiving federal highway funds, STAA and STURAA require states to set aside at least 10% of all federally-aided highway contracts to DBEs.[1] The federal statutes permit states to use a DBE set-aside of less than 10% upon application to and approval by the Secretary of Transportation as set forth in DOT regulations. *See* 49 C.F.R. §§ 23.64(e), 23.65 and 49 C.F.R. Part 23, Subpart D, Appendix D (1989).

Federal DBE regulations establish a rebuttable presumption that small businesses owned and controlled by women and minorities (including Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, or Asian–Indian Americans and others) are DBEs. 49 C.F.R. § 23.62 (1989). Businesses that are presumed to be disadvantaged are subject to decertification of their DBE status if the participating state determines that they are not in fact disadvantaged. On the other hand, businesses that are not presumed to be disadvantaged may be certified as DBEs by the Small Business Administration or by the state upon a sufficient showing.

Utah participates in the federal DBE program and has adopted a DBE plan that mirrors the federal statutory and regulatory structure in every significant respect, including the annual goal requirement that 10% of all federally funded UDOT contracts be awarded to disadvantaged business enterprises as defined by federal law. Utah has never sought a waiver from the annual 10% set-aside, nor has the State made any findings of past discrimination in Utah's public construction industry. The State has a Civil Rights Coordinator who oversees implementation of the DBE program, and the State has published a directory in which 106 small businesses are list-

ed as eligible to bid as DBEs on federally assisted UDOT construction projects. Some of these DBEs are located outside of the State. Utah's DBE program requires all DBE firms to recertify annually. The Stipulation of Facts does not set forth the percentage of "disadvantaged" transportation contractors that do business in Utah. However, the parties have stipulated that Utah has a minority population that is approximately 7.6% of the general population.

Two DBE goals are used in the DBE program: the annual goal (the 10% goal); and individual contract goals that UDOT establishes for DBE participation as subcontractors in specific prime contracts, which also is usually set by UDOT at 10%. *See* 49 C.F.R. Part 23, Subpart D, Appendix A; UDOT DBE plan, p. 10. Through bid specifications, UDOT advises bidders (prime contractors) of the terms and conditions upon which contracts will be awarded. Determination of whether the prime contractor has complied with the DBE contract goal is made by the UDOT Civil Rights Coordinator and the Assistant Director of UDOT. Plaintiff is only challenging the 10% annual goal of UDOT. The State has frequently granted waivers from the DBE goal on specific projects.

According to the Stipulation of Facts, plaintiff submitted the lowest bids for two subcontracting jobs, but the contracts in each case were awarded to DBEs who submitted higher bids. In the first contract, Albert Lowdermilk, Inc., was awarded the prime contract which contained a DBE requirement of 10%. Plaintiff submitted a subcontract quote to Lowdermilk of $13,250 and a DBE quoted $18,750. Nevertheless, Lowdermilk awarded the subcontract to the DBE in order to fulfill the 10% requirement. In the second contract, W.W. Clyde and Company was awarded the prime contract which also had a DBE re-

---

**4.** Section 105(f) of the STAA and section 106(c) of the STURAA both provide:

*Except to the extent that the Secretary determines otherwise,* not less than 10 per centum of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged indi-

viduals as defined by section 8(d) of the Small Business Act (15 U.S.C. section 637(d)) and relevant subcontracting regulations promulgated pursuant thereto.

Pub.L. No. 97–424 § 105(f), 96 Stat. 2097, 2100; Pub.L. No. 100–17 § 106(c), 101 Stat. 132, 145 (emphasis added).

quirement of 10%. Plaintiff quoted $131,-204 on a subcontract and a DBE quoted $134,286. Again, the DBE was awarded the subcontract. The Stipulation of Facts does not indicate whether plaintiff petitioned the State for a waiver from the 10% set-aside requirement on these particular projects.

## ANALYSIS

Plaintiff challenges the constitutionality of Utah's implementation of the DBE program established under STAA and STU-RAA. Plaintiff requests a declaratory judgment and a permanent injunction against Utah's DBE program until the state makes the findings outlined in the recent Supreme Court case of *City of Richmond v. J.A. Croson, Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Croson*, the Supreme Court declared that a minority business program enacted by the city of Richmond, Virginia, was unconstitutional because the city failed to justify the use of suspect classification under equal protection strict scrutiny analysis. Plaintiff seeks to require the State of Utah to follow *Croson* by making findings of state sponsored discrimination and to seek a waiver of the annual 10% DBE set-aside goal from the Secretary of Transportation. The defendants argue, on the other hand, that Utah's DBE program was established pursuant to federal law and is constitutional under the Supreme Court's earlier decision in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). For reasons explained hereafter, the court agrees with defendants that this case is properly analyzed under *Fullilove*, not *Croson;* that the State is not required to make findings of past discrimination in connection with its participation in the DBE program; and that there is an insufficient factual basis for the court to compel the State to seek a waiver from the 10% set-aside.

---

5. Section 105(f) the STAA, at issue in this case, was modeled after and has the same legislative purpose as section 103(f)(2) of the Public Works Employment Act of 1977—the act found to be facially constitutional by the Supreme Court in *Fullilove*. *See* 128 Cong.Rec. H8954 (daily ed.

## I. THE *FULLILOVE* AND *CROSON* DECISIONS

In *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court rejected a facial challenge to the constitutionality of a federal affirmative action program which required that 10% of federal funds granted for local public works projects be used to procure services from minority business enterprises ("MBE"). The statute at issue in *Fullilove* was section 103(f)(2) of the Public Works Employment Act of 1977 and attending regulations promulgated by the Secretary of Commerce. Both parties in this case acknowledge that the Department of Transportation's DBE affirmative action program at issue in the instant case was modeled after the MBE program upheld in *Fullilove*.[5]

Foremost in the court's analysis and approval of the 10% set-aside program in *Fullilove* was the fact that it was a program enacted by Congress. The Court stated:

> A program that employs racial or ethnic criteria, even in a remedial context, calls for close examination; yet we are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to provide for the ... general Welfare of the United States" and "to enforce, by appropriate legislation" the equal protection guarantees of the "Fourteenth Amendment."

*Id.* at 472, 100 S.Ct. at 2771 (citations omitted).

After tracing the legislative history of the Commerce Department's MBE program, the Court in *Fullilove* first determined that the remedial objectives of that legislation were within the enforcement power of Congress under section 5 of the Fourteenth Amendment "insofar as that program pertains to the actions of state and local grantees." *Id.* at 478, 100 S.Ct.

---

Dec. 6, 1982); 128 Cong.Rec. S14211 (daily ed. Dec. 8, 1982). Both set-aside programs also refer to § 2[8] of the SBA Act, 15 U.S.C. § 637, regarding the definition of disadvantaged businesses.

at 2775. The Court noted that although Congress did not make specific "findings" of past discrimination in public procurement practices, the Court was "satisfied that Congress had abundant historical basis from which it could conclude" such a finding. *Id.* In an earlier part of Chief Justice Burger's opinion for the *Fullilove* Court, it was noted that the sponsor of the 10% set-aside program had cited Congress to "the marked statistical disparity that in fiscal year 1976 less than 1% of all federal procurement was concluded with minority business enterprises, although minorities comprised 15–18% of the population." *Id.* at 459, 100 S.Ct. at 2765 (citation omitted).[6]

Next, the *Fullilove* Court held that the Congress's use of racial and ethnic criteria, in a "limited way," and "as a condition attached to a federal grant" was narrowly tailored to the achievement of the remedial objective of the set-aside program. *Id.* at 480, 100 S.Ct. at 2775. The Court emphasized that the program contained a waiver provision, virtually identical to the waiver provision at issue in the instant case, whereby a state or a general contractor could be given a set-aside goal of less than 10%, upon "demonstration that, despite affirmative efforts, this [10%] level of participation cannot be achieved without departing from the objectives of the program." *Id.* at 482, 100 S.Ct. at 2776 (citations omitted).[7] The *Fullilove* Court also noted that the set-aside program contained "an administrative mechanism, including a complaint procedure, to ensure that only bona fide

MBE's are encompassed by the remedial program," such as in the instant case. *Id.* (citations omitted).

Nine years after the *Fullilove* decision, the Supreme Court decided *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Croson* the Court held that a set-aside program enacted by the City of Richmond failed to pass constitutional muster under strict scrutiny equal protection analysis. In that case, the City of Richmond had established a 30% set-aside for minority business enterprises on all city construction projects. The plaintiff, Croson, issued a plumbing subcontract bid as part of a renovation project of the city jail. In order to meet the 30% set-aside, the prime contractor determined that the plumbing fixtures would have to be provided by an MBE. One MBE expressed interest in the plumbing subcontract and submitted an untimely bid that was over $6,000 higher than Croson's bid. Croson requested a waiver of the 30% set-aside. The waiver request was denied and the city decided to rebid the project. Thereafter, Croson filed an action under 42 U.S.C. section 1983 arguing that the Richmond ordinance was unconstitutional on its face and as applied.

In holding that Richmond's 30% set-aside program was unconstitutional, the Court in *Croson* distinguished the city's program from the federal affirmative action program upheld in *Fullilove*. The Court noted that states and municipalities have some power to remedy the effects of prior dis-

---

**6.** The recent Supreme Court decision in *Metro Broadcasting, Inc. v. Federal Communication Comm'n*, —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), also upheld the constitutionality of a federal affirmative action program—both facially and as applied. That case involved an FCC program granting preferences to minority broadcast license applications. The Court upheld the FCC's preference policies because "they bear the imprimatur of longstanding congressional support and are substantially related to the achievement of the important governmental objective of broadcast diversity." *Id.* —— U.S. at ——, 110 S.Ct. at 3027–28, 111 L.Ed.2d at 485. *Metro Broadcasting* is not directly applicable to the affirmative action program at issue in the instant case inasmuch as the preference program in that case did not entail state participation.

**7.** Justice Powell's concurrence in *Fullilove* also emphasized the importance of the waiver provision:

> Although the set-aside is pegged at a reasonable figure, its effect might be unfair if it were applied rigidly in areas of the country where minority group members constitute a small percentage of the population. To meet this concern, Congress enacted a waiver provision into § 103(f)(2).

448 U.S. at 514, 100 S.Ct. at 2793 (Powell, J., concurring). *See* footnote 9, *infra*, quoting regulation which sets forth the applicable factors in connection with any application for waiver of the congressionally mandated 10% set-aside requirement, and accompanying footnotes 9 and 10.

crimination, 109 S.Ct. at 706, but the Court held that a program of a state or political subdivision is not entitled to the same deference as a congressional program because Congress, unlike the states, has special remedial power under the Fourteenth Amendment:

> That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori,* the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision.

109 S.Ct. at 719. In order for states or municipalities to enact affirmative action programs, the *Croson* Court required such entities to make specific findings of past discrimination:

> While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief. Congress has made national findings that there has been societal discrimination in a host of fields. If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity.

*Id.* at 727 (citation omitted).

## II. UNDER *FULLILOVE,* UTAH IS NOT REQUIRED TO MAKE FINDINGS

 Plaintiff argues that in order for Utah's DBE program to be constitutional, the state must comply with the stringent fact finding requirements outlined by the Supreme Court in *Croson* as quoted above. Plaintiff contends that "[w]hen the Utah Department of Transportation chose to implement STAA and STURAA, the baton passed from the U.S. Government to the State of Utah," and at that instant it became incumbent upon the State to make the findings outlined in *Croson.* Plaintiff's Mem. at 5. Specifically, plaintiff argues that the before the State can participate in the STURAA program

> it would have to find specific evidence of past state sponsored discrimination and, if it found such discrimination, it would have to then determine that there was a 'compelling governmental interest' in using race conscious relief, and finally, in order to fulfill that governmental interest, it would have to chose a means that was 'narrowly tailored' to remedy the effects of such state sponsored discrimination.

*Id.* Inasmuch as the State of Utah has not made any of these finding under *Croson,* plaintiff contends that Utah's DBE program violates the equal protection guarantees of the Fourteenth Amendment.

Defendants argue, on the other hand, that the Supreme Court's decision in *Fullilove,* not *Croson,* controls the decision in this case. Defendants note that the challenged DBE program is congressionally authorized and mandated for all states which are recipients of federal transportation funds, and that Utah's participation in this federally enacted affirmative action program does not convert the program into a state program necessitating independent *Croson* -type findings of past discrimination. The parties have stipulated that Utah's DBE program tracks or complies with the federal DBE statutes and regulation in every significant respect. For purposes of the pending cross motions for summary judgment, plaintiff has further stipulated that the federal DBE statutes and implementing regulations are constitutional on their face, and that these statutes and regulations were modeled after the substantially similar federal-state 10% set-aside program upheld by the Supreme Court in *Fullilove.* Defendants maintain that "the *Croson* decision reaffirms the constitutionality of the affirmative action program challenged here, and leaves intact the application of *Fullilove* to Congressionally-mandated programs." Defendants' Mem. at 18.

The court agrees with the defendants that Utah's participation in the federally enacted DBE program does not make it incumbent upon the State to make independent factual findings in order for the program to be constitutional. In enacting STAA and STURAA, Congress already has made a nationwide determination that. the set-aside program was necessary to help remedy the effects of past discrimination. In *Fullilove,* the Supreme Court indicated that great deference is afforded to Congressional determinations in this regard. 448 U.S. at 472, 100 S.Ct. at 2771–72. This deference to congressionally enacted affirmative action programs was reaffirmed by Justice O'Connor's opinion for the Court in *Croson,* and it was the basis from which the program enacted by the City of Richmond in that case was distinguished. 109 S.Ct. at 718–20. This case would be properly analyzed under *Croson* if the State of Utah had enacted a DBE program based on its own initiative. However, the only reason the State has its DBE program is because Congress required it to have such a program as a condition for the State to receive federal highway funds. The City of Richmond in the *Croson* case adopted its 30 percent set-aside program on its own accord, and not in connection with any federal financing arrangement.

Not only is the affirmative action program in *Croson* distinguishable from the federal set-aside program in place in Utah, but in *Fullilove* the Supreme Court determined that an almost identical set-aside program entailing state participation satisfied equal protection scrutiny. The STAA and the STURAA are Acts of Congress which outline the requirements for interstate transportation projects performed by state entities with the assistance of federal funds. In essence, the Utah Department of Transportation is a junior partner to the U.S. Department of Transportation, and it may properly rely on the findings of Congress. *See Milwaukee County Pavers Ass'n. v. Fiedler,* 710 F.Supp. 1532, 1545–46 (W.D.Wis.1989) (where state STURAA program was enacted pursuant to a federal-state legislative framework, the state may rely on the findings of Congress).

Although *Fullilove* only involved a facial challenge to the Department of Commerce's set-aside program, there is nothing in *Fullilove* to suggest that states which elect to participate in the program by accepting federal funds are thereby obligated to make findings of past discrimination in addition to the determination already made by Congress and the President. In fact, the Court's emphasis that Congress initiated the set-aside program pursuant to section 5 of the Fourteenth Amendment, and that the Court should afford deference to the unique remedial powers of Congress, suggests that no state findings are necessary. Chief Justice Burger stated for the *Fullilove* Court:

> It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. *Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional antidiscrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may, as here, authorize and induce state action to avoid such conduct.*

448 U.S. at 483–84, 100 S.Ct. at 2777 (citations omitted, emphasis added); *see also id.* at 478, 100 S.Ct. at 2774–75 (MBE legislation was lawfully enacted under § 5 of the Fourteenth Amendment "insofar as that program pertains to the actions of state and local grantees").

The court is unaware of any authority in support of plaintiff's contention that states which participate in the federal DBE program are required to make the findings required of the City of Richmond in the *Croson* case. In fact, all other federal courts that have considered this issue have held that such a result would violate the Supreme Court's decision in *Fullilove,* and *Fullilove* is still the law with regard to federally enacted set-aside programs involving state participation. *See Harrison & Burrowes Bridge Constructors, Inc. v.*

*Cuomo,* 743 F.Supp. 977 (N.D.N.Y.1990); *Tennessee Asphalt Co. v. Farris,* Civ. No. 3–85–1176, Slip Op. (D.Tenn. June 14, 1990); *Milwaukee County Pavers Ass'n. v. Fiedler,* 731 F.Supp. 1395, 1410 (W.D.Wis. 1990); *Cone Corp. v. Florida Dept. of Transp.,* 1989 WL 205230, 1989 U.S. Dist. LEXIS 16743, 16752 (N.D.Fla. August 1, 1989); *Carpenter v. Dole,* 1988 WL 156282 (E.D.N.C. June 16, 1988). For the foregoing reasons, this court holds that Utah's DBE program is properly analyzed under *Fullilove,* not *Croson,* and that the State of Utah is not required under the Fourteenth Amendment to make additional findings of past discrimination or otherwise as a participant in this federal-state program.

## III. UTAH IS NOT PRESENTLY REQUIRED TO SEEK A WAIVER

■ As discussed earlier, STAA and STURAA contain a waiver provision whereby a state can petition the Secretary of Transportation for an annual DBE set-aside figure other than the standard 10% amount. A similar waiver provision was regarded as significant in the Supreme Court's decision to uphold the constitutionality of the 10% set-aside program in *Fullilove.* It is undisputed in this case that Utah has not requested a waiver from the annual 10% set-aside requirement.

Plaintiff contends that the waiver provision was made part of the federal DBE program as a constitutional safety valve—

to enable states to adjust the set-aside percentage according to their particular circumstances. Thus, plaintiff argues that Utah's adherence to the annual 10% set-aside figure,[8] without regard to the fact that Utah has a low minority population as compared with many other states, renders Utah's DBE program not "narrowly tailored" and unconstitutional as applied.

Plaintiff's argument in not without some force. At first blush, it would seem reasonable to conclude that Utah should not be required to implement the same degree of affirmative action relief to disadvantaged businesses doing business in this State as compared with those states with a higher per capita minority population. However, plaintiff has failed to demonstrate that the 10% set-aside figure is inappropriate for Utah as determined by the waiver requirements set forth in the federal regulations implementing the federal DBE program—which regulations plaintiff has stipulated are facially valid.

The regulations governing waiver are set forth in in 49 C.F.R. §§ 23.64(e), 23.65, and 49 C.F.R. Part 23, Subpart D, Appendix D (1989). Regulation 23.65 requires a petitioning state to justify why it should be entitled to a set-aside goal of less than 10%. One clear import of this regulation is that in order for a state to obtain federal approval of a waiver request, the state must demonstrate that it has been unable to attain the 10% level.[9] In addition, this

---

8. Plaintiff does not appear to allege that the set-aside goals for the *specific* projects in which he submitted bids were inappropriately set by the State. *See* 49 C.F.R. § 23.45(g) and Appendix A to § 23.45 (regulations regarding seeking exemption from specific contract DBE goal). Rather, plaintiff's arguments are directed towards the State's failure to seek a waiver from the federal government of the *annual* 10% set-aside goal. *See* 49 C.F.R. §§ 23.64(e), 23.65, Appendix D to 49 C.F.R. part 23, Subpart D (regulations governing waiver of annual state set-aside goal).

9. Regulation 23.65 provides:

**Content of justification.**
An FHWA or UMTA or FAA recipient requesting approval of an overall goal of less than ten percent shall include information on the following points in its justification. Guid-

ance concerning this information is found in Appendix D.
(a) The Recipient's efforts to locate disadvantaged businesses;
(b) The recipient's efforts to make disadvantaged businesses aware of contracting opportunities;
(c) The recipient's initiatives to encourage and develop disadvantaged businesses;
(d) Legal or other barriers impeding the participation of disadvantaged businesses at least a ten percent level in the recipient's DOT-assisted contracts, and the recipient's efforts to overcome or mitigate the effects of these barriers;
(e) The availability of disadvantaged businesses to work on the recipient's DOT-assisted contracts;
(f) The size and other characteristics of the minority population of the recipient's jurisdiction, and the relevance of these factors to the

waiver condition was acknowledged by the Supreme Court in both *Fullilove* and *Croson*. Chief Justice Burger wrote in *Fullilove* that waiver of the 10% set-aside can be granted upon "demonstration that, despite affirmative efforts, this level of participation cannot be achieved without departing from the objectives of the program." 448 U.S. at 482, 100 S.Ct. at 2776. Justice Powell's concurring opinion in *Fullilove* stated that "[t]he factors governing issuance of a waiver include the availability of qualified minority contractors in a particular geographic area, the size of the locale's minority population, and the efforts made to find minority contractors." *Id.* at 514, 100 S.Ct. at 2793. Referring to the *Fullilove* MBE program, Justice O'Connor's opinion in *Croson* explained that "a waiver could be sought where minority businesses were not available to fill the 10% requirement...." 109 S.Ct. at 718. An undisputed fact in this case is that UDOT consistently has been able to meet the 10% set-aside goal.[10] Under these circumstances, requiring the State to seek a waiver would be a futile act.

The only evidence that plaintiff has set forth in urging the court to require the State to seek a waiver is the stipulated fact that Utah's minority population is approximately 7.6% of Utah's total population. This statistic is only relevant insofar as it bears upon the total number of disadvantaged businesses that are available to bid on UDOT transportation contracts.[11] DBEs include not just businesses owned and controlled by minorities, but also businesses owned and controlled by women and by any other persons who can demonstrate that they are economically and socially disadvantaged. Further, nothing in the statutes or regulations prohibits out-of-state businesses from bidding on projects as DBEs so long as those businesses have been certified as bona fide DBEs by the state receiving the bids. Of course, if out of state DBE bids are unreasonably high, because of added costs or for other reasons, a waiver could be sought and would be granted as to such bids. *See Fullilove*, 448 U.S. at 469–71, 100 S.Ct. at 2770–71. Unless and until there is evidence demonstrating that an insufficient number of disadvantaged businesses are available to work on Utah DOT-assisted contracts at the 10% level, this court is of the view that the State is not obligated to seek a waiver from the federal 10% annual set-aside requirement.

As was true of the set-aside program upheld in *Fullilove*, significant provisions of the Utah DBE program help ensure minimum impact upon non-DBEs and that only bona fide subcontractors qualify as DBEs. DBEs interested in federally assisted Utah contracts must certify their DBE status with UDOT annually. Businesses that are not owned and controlled by minorities or women can still qualify as a DBE if they can demonstrate that they are economically and socially disadvantaged. Finally, under appropriate circumstances already discussed, the State as well as individual contractors can seek a waiver of the 10 percent set-aside figure. Accordingly, the court concludes that the federal DBE program as applied in Utah is suffi-

availability or potential availability of disadvantaged businesses to work on the recipient's DOT-assisted contracts; and

 (g) A summary of the views and information concerning the availability of disadvantaged businesses and the adequacy of the recipient's efforts to increase the participation of such businesses provided by the persons and organizations consulted by the recipient under § 23.64(f)(3).

49 C.F.R. § 23.65 (1989); *see also* 49 C.F.R. § 23, Subpart D, Appendix D.

**10.** *See* Exhibits 1 and 2 to defendants' Motion for Summary Judgment. Also, on numerous occasions UDOT has granted a prime contractor's application for a waiver from the project set-aside goal based upon the contractor's good faith efforts to achieve the goal. Responses Nos. 5 & 6 by defendants Findlay and Blanco, UDOT, to plaintiff's Second Set of Interrogatories.

**11.** *Cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) ("when special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value") (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, n. 13, 97 S.Ct. 2736, 2742, n. 13, 53 L.Ed.2d 768 (1977)).

ciently narrowly tailored to meet legitimate governmental objectives and that it does not violate the equal protection guarantees of the Fourteenth Amendment.

Based on the foregoing, defendants' Motion for Summary Judgment is GRANTED and plaintiff's Motion for Summary Judgment is DENIED. Counsel for defendants are directed to prepare a form of Judgment consistent with this Memorandum Decision and Order and lodge the same with the court after compliance with local rule 13(e).

IT IS SO ORDERED.