CAPELETTI BROTHERS, INC., Weekley Asphalt Paving, Inc., Westwind Contracting, Inc., and Hardrives Company, Plaintiffs,

v.

METROPOLITAN DADE COUNTY, Joaquin Avino, manager of Dade County, Allied Contractor's Association, Inc., Southeastern Concrete Floors Co., Inc., Benjamin Plumbing, Inc., Richard B. Cheney, Secretary of the United States Department of Defense, William K. Reily, Administrator of the United States Environmental Protection Agency, Samuel J. Skinner, Secretary of the United States Department of Transpor-

tation, Jack F. Kemp, Secretary of the United States Department of Housing and Urban Development, Dale Twachtmann, Secretary of the State of Florida Department of Environmental Regulation, Defendants.

METROPOLITAN DADE COUNTY, a political subdivision of the State of Florida, and Joaquin Avino, Cross–Plaintiffs,

v.

Samuel J. SKINNER, United States Secretary of Transportation, Jack F. Kemp, United States Secretary of Housing and Urban Development, Richard B. Cheney, Secretary of the United States Department of Defense, William K. Reily, Administrator of the United States Environmental Protection Agency, and Dale Twachtmann, Secretary of the State of Florida Department of Environmental Regulation, Cross–Defendants.

No. 90–0678–CIV.R.

United States District Court,
S.D. Florida.

Oct. 29, 1991.

Herbert P. Schlange, Atlanta, Ga., for plaintiffs.

Delora L. Kennebrew, Harry F. Chiles, Tallahassee, Fla., Robert A. Cuevas, Jack Hartog, Miami, Fla., for defendants.

Gary Siplin, Miami, Fla., for Intervenors.

## ORDER GRANTING SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE is before the Court on motions for summary judgment by the defendants on issues concerning the standing of Plaintiffs to bring this suit and the standing of Dade County ("County") to bring a cross-complaint against the Department of Environmental Regulation of the State of Florida ("State") and the various federal defendants.

### BACKGROUND

Plaintiffs have brought a challenge under the Equal Protection Clause of the Fourteenth Amendment to the County's use of race-conscious measures in awarding County- and federally-funded heavy construction projects. The County utilizes such measures pursuant to two different statutory schemes. The first is a Congressionally authorized Disadvantaged Business Enterprise ("DBE") program authorized by the Surface Transportation and Uniform Relocation Assistance Act ("STURAA"). The second is a Black Business Enterprise ("BBE") program enacted by the County. Plaintiffs seek declaratory and injunctive relief against the County's use of allegedly unconstitutional race-conscious measures under both programs. They also seek recovery of whatever damages they can show at trial. Only two plaintiffs remain in this case: Capeletti Brothers, Inc. ("Capeletti") and Westwind Contracting, Inc. ("Westwind").

The County filed a cross-claim against the State and federal defendants. It seeks to enjoin them from cutting off federal funds to the County if the County is ultimately enjoined by this Court from utilizing race-conscious measures pursuant to STURAA. The County's concern apparently arises from the fact that the awarding of federal funds to state and local governments under STURAA is within the discretion of the Secretary of DOT, and is carried out by the State. If the Court were to forbid such funds to be used in race-conscious measures by the County, the County argues, the funds might be diverted to other recipients who are not forbidden from complying with federally authorized DBE programs. Tr. 11.

Both Plaintiffs are prime contractors and subcontractors on heavy construction projects in Dade County. The parties agree that Westwind has standing to challenge the County's BBE program, as it was the low bidder on a County-funded project but was not awarded the contract due to its failure to comply with the County Program. There is no evidence indicating that Capeletti lost a contract due to the County Program. There is also no evidence that either Westwind or Capeletti bid on projects funded by the Department of Housing and Urban Development ("HUD") or the Environmental Protection Agency ("EPA"). Plaintiffs' counsel conceded at oral argument that Plaintiffs do not bid on HUD, EPA, or State Department of Environmental Regulation projects. Tr. 32–33. Plaintiffs do from time to time bid on projects funded by the U.S. Department of Transportation ("DOT"), which are therefore subject to the provisions of STURAA. There is no evidence that Plaintiffs have lost any contracting opportunities with DOT as a result of STURAA.

Plaintiffs contend that the County Program violates the Equal Protection clause because the County failed to make the necessary findings to support its conclusion that there has been past discrimination in the construction industry in Dade County. They also assert that there is no evidence (or at least insufficient evidence) to demonstrate that blacks have been discriminated against in the construction industry in Dade County. Therefore, they conclude, the Program is not a lawful attempt to remedy identified discrimination in the construction industry in Metropolitan Dade County.

In *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a majority of the Supreme Court struck down a set-aside program enacted by the City of Richmond, holding that the City had not demonstrated that it had a compelling interest in enacting its race-conscious measures for the awarding of contracts let by the City. *Croson*, 488 U.S. at 505, 109 S.Ct. at 727, 102 L.Ed.2d at 889. A four justice plurality in *Croson* emphasized that the only state interest compelling enough to justify race-conscious programs by state or local governments is the remedying of the effects of identified discrimination within its jurisdiction. *Croson*, 488 U.S. at 496–98, 509, 109 S.Ct. at 722–23, 729, 102 L.Ed.2d at 884–85, 892 (plurality opinion). Justice Scalia, who did not join Justice O'Connor's opinion, would have imposed an even higher standard. Justice Scalia expressed his view that state or local governments could only act by race to undo the effects of past discrimination where it is necessary to eliminate their own maintenance of a system of unlawful racial classification. *Croson*, 488 U.S. at 524, 109 S.Ct. at 737, 102 L.Ed.2d at 901 (Scalia, J., concurring).

■ A majority of the Court also emphasized that a State or local government must make factual findings sufficient to provide a "strong basis in evidence for its conclusion that remedial action [is] necessary." *Croson*, 488 U.S. at 500, 109 S.Ct. at 724, 102 L.Ed.2d at 886. The Court rejected the proposition that a State or local government could simply rely on Congressional findings of past discrimination in the construction industry to support its conclusion that past discrimination existed and that remedial action is needed. *Croson*, 488 U.S. at 504, 109 S.Ct. at 726–27, 102 L.Ed.2d at 889. Therefore, if the County wishes to justify the disparate treatment of various racial groups in the awarding of public heavy construction contracts under its BBE Program, it must show that it had a strong basis in evidence for concluding that nonminority contractors, or the County itself, were systematically excluding black contractors and subcontractors from business opportunities within the jurisdiction of the County.

■ Plaintiffs also challenge the County's utilization of race-conscious measures pursuant to STURAA. Despite Justice Kennedy's understandable puzzlement concerning "[t]he process by which a law that is an equal protection violation when enacted by a State becomes transformed to an equal protection guarantee when enacted by Congress," *Croson*, 488 U.S. at 518, 109 S.Ct. at 734, 102 L.Ed.2d at 898 (Kennedy, J., concurring), it is clear that benign race-conscious measures mandated by Congress are subjected to a lesser degree of judicial scrutiny, and may be utilized to further a broader range of ends, than those enacted by state or local governments. Subsequent to *Croson*, a majority of the Supreme Court held that Congressional race-conscious measures, even if not "remedial" in nature, are constitutionally permissible to the extent that they serve important government objectives within the power of Congress and are substantially related to achievement of those objectives. *Metro Broadcasting, Inc. v. FCC*, 497 U.S. ——, 110 S.Ct. 2997, 3008–09, 111 L.Ed.2d 445, 462–63 (1990).

■ It is also clear that Congress need not make factual findings in support of affirmative action legislation with the same degree of specificity as state or local governments. As Justice Powell noted in his separate concurring opinion in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court up-

held the Congressional set-aside program at issue in spite of the absence of specific factual findings with respect to the particular legislation challenged. *Fullilove,* 448 U.S. at 502, 100 S.Ct. at 2787, 65 L.Ed.2d at 940. Justice Powell emphasized, in language approved by a three member plurality in *Croson* and echoed in *Metro Broadcasting,* that "[t]he degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body." *Fullilove,* 448 U.S. at 515 n. 14, 100 S.Ct. at 2794 n. 14, 65 L.Ed.2d at 948 n. 14; *see also Croson,* 488 U.S. at 489, 109 S.Ct. at 718, 102 L.Ed.2d at 879; *Metro Broadcasting,* 110 S.Ct. at 3009, 111 L.Ed.2d at 463.

The question involved in this case is whether a state or local government acting pursuant to a Congressionally mandated DBE program must make the findings of past discrimination within the locality as required by *Croson,* or whether it may rely on Congress' findings as long as it does not exceed the authority granted it by Congress. The weight of the case authority supports the latter conclusion. *See Tennessee Asphalt v. Farris,* 942 F.2d 969 (6th Cir.1991) (*Fullilove,* not *Croson,* applies in determining the constitutionality of the Tennessee DOT set-aside program enacted pursuant to STURAA); *Milwaukee County Pavers Ass'n v. Fiedler,* 922 F.2d 419, 423–24 (7th Cir.) ("The joint lesson of *Fullilove* and *Croson* is that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. And one way it can do that is by authorizing states to do things that they could not do without federal authorization."), *cert. denied* — U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991); *Ellis v. Skinner,* 753 F.Supp. 329 (D.Utah 1990) (State DBE program enacted pursuant to STURAA properly analyzed under *Fullilove,* not *Croson* ).

This, then, is a review of the legal and factual background of the case. The Court now turns to the immediate issues presented today: (1) whether the plaintiffs have standing to challenge either the County's actions pursuant to STURAA or the County Program; and (2) whether the County has standing to bring its cross-claim against the State and federal defendants.

## ANALYSIS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of informing the Court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). If the movant meets that burden, the burden shifts to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Id.*

■ The Eleventh Circuit has recently enunciated a standard for determining whether a plaintiff has standing to challenge a DBE program under the Equal Protection clause. *See Cone Corp. v. Florida Dep't of Transportation,* 921 F.2d 1190 (11th Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991). A plaintiff seeking declaratory and injunctive relief against an affirmative action program on equal protection grounds can satisfy the Article III standing requirements of injury in fact and causation only if he or she shows that a government official is likely to deprive the plaintiff of contracts on account of his or her race in violation of the fourteenth amendment. *Cone,* 921 F.2d at 1209. To make this prediction, the Court may look at two types of evidence: (1) specific instances in the past where the defendant has injured the plaintiff or others; and (2) statutes, regulations, settled

policies, judicial decisions, and other rules which establish the official's authority, mandate the acts he or she must perform, and circumscribe his or her discretion, if any. *Cone,* 921 F.2d at 1205 n. 48 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). In analyzing the second category of evidence, the Court should first look to the language of the statute or ordinance at issue. *Id.* at 1207. If the statute on its face directs a government official to discriminate in violation of the fourteenth amendment, the plaintiff has demonstrated that he has standing to challenge the statute. If, on the other hand, the statute gives the government discretion to determine when set-asides and goals are necessary, the Court must turn to other sources, particularly the regulations promulgated under the statute, to determine the likelihood that a plaintiff's equal protection rights will be violated through operation of the statute.

In *Cone,* the Court held that the structure of a DBE program, by virtue of the added costs it imposes on prime contractors and subcontractors, does not constitute a sufficient threat of injury to give plaintiffs standing to seek injunctive and declaratory relief. *Id.* at 1209 n. 57. The Court reasoned that such burdens are imposed on all contractors, including DBE contractors. *Id.* Further, the Court reasoned that no actual injury occurred in most cases because contractors could pass the costs along to the government in its bid. *Id.* Even if a particular business were unable to do so, which was apparently the case in *Cone,* the *Cone* court reasoned that the resulting smaller profits would not be a unique and particularized injury because the problem is common to all contractors. *Id.* Put another way, the fact that all contractors (and indeed all taxpayers) must pay for a government affirmative action program is insufficient to establish that the program is likely to violate a contractor's equal protection rights.

■ As an initial matter, the Court must address Plaintiffs' contention that if they have standing to challenge the County's program, they automatically have standing to challenge the federal program. Plaintiffs assert that this is so because it is the County's race-conscious measures that are being challenged without regard to whether they are employed on federally- or County-funded projects. This argument need not detain the Court long.

Plaintiffs seek to challenge the constitutionality of two separate and distinct legislative schemes: one created by Congress and one created by the County. It is clear that to challenge a legislative enactment, one must have standing to challenge that particular enactment. The mere fact that one is injured by virtue of the operation of one statute does not give one standing to challenge all other statutes enacted by the same governmental authority. For example, in *S.J. Groves & Sons Co. v. Fulton County,* 920 F.2d 752, 758 (11th Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 2893, 115 L.Ed.2d 1057 (1991), the Court held that the plaintiff had standing to challenge a 1982 County MBE program under which it had been denied a contract, but lacked standing to challenge a 1984 MBE program subsequently enacted by the same County, since the plaintiff had not bid for a contract governed by that program. Accordingly, the standing questions with respect to the federally authorized program must be analyzed separately from the standing issue regarding the County program.

A. *Standing to Challenge the Federal Program.*

■ This is not the first time that STURAA has found its way into the federal courts. *See, e.g., Tennessee Asphalt v. Farris,* 942 F.2d 969 (6th Cir.1991); *Milwaukee County Pavers Ass'n v. Fiedler,* 922 F.2d 419 (7th Cir.1991), *cert. denied* 111 S.Ct. 2261, 114 L.Ed.2d 714; *Ellis v. Skinner,* 753 F.Supp. 329 (D.Utah 1990). Section 106(u)(1) of STURAA provides that

Except to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts authorized to be appropriated ... after the date of the enactment of this Act shall be expended with small business concerns owned and

controlled by socially and economically disadvantaged individuals.

Pub.L. No. 100–17, § 106(c)(1), 101 Stat. 132, 145. Applying the test laid out in *Cone*, the Court must first look to see if there is evidence of past violations of Plaintiffs' equal protection rights by Defendants. Plaintiffs claim that they have made a more substantial and particularized showing of injury in this case than did the plaintiffs in *Cone*. The only evidence, however, of injuries incurred through the operation of the federal program under STURAA is an unsworn declaration under penalty of perjury by Joe Capeletti, President of Capeletti Brothers. The declaration states that Capeletti was awarded contracts in two projects that were funded partially by federal funds and which contained DBE goals. It states that in each case, Capeletti incurred higher costs as a result of these goals. In one case the DBE subcontractor defaulted and in the other Capeletti apparently could have done the subcontracted work for less money than could the DBE subcontractor that was hired. In neither case, the declaration contends, was Capeletti able to pass the additional costs along to the government. Plaintiffs argue that the Declaration of Joe Capeletti distinguishes this case from *Cone* because it establishes that in two cases, Capeletti suffered an injury sufficient to confer standing to seek injunctive and declaratory relief.

*Cone*, however, is not distinguishable in this respect. *Cone* recognized that "Even if the contractor does not always include the increased cost in its bid, *as the plaintiffs' evidence seems to indicate*, the resulting smaller profits are a problem common to all contractors." *Cone*, 921 F.2d at 1209–10 n. 51 (emphasis added). Thus, *Cone* recognized the possibility that a contractor might not be able to pass on the costs of satisfying the requirements of a DBE program, but nonetheless found that such an "injury" would be insufficient to confer standing, because it is a risk faced by all contractors. Indeed, the *Cone* court noted that the challenged program could adversely affect a non-DBE contractor in only three ways: by excluding it from bid-

ding altogether on projects subject to a set-aside; by denying a prime contractor a contract on which it submitted the low bid due to a DBE goal; and by denying the award of a subcontract to a subcontractor who submitted the low bid because of a DBE goal. *Cone*, 921 F.2d at 1200.

The Court must therefore look to the second category of evidence—the statutes, regulations, policies, and other rules cloaking government officials with authority, mandating action by officials, and circumscribing their discretion—to determine whether the County is likely to violate the equal protection rights of Plaintiffs through its use of race-conscious measures pursuant to STURAA. The Court must first analyze the language of the statute. Like the Florida statute challenged in *Cone* (which was modelled after STURAA), STURAA expressly grants the Secretary of DOT discretion to determine both the necessity of establishing minority participation goals or set-asides and the amount and percentage of expenditures to be reserved for DBEs. Thus, STURAA does not mandate anything other than the exercise of discretion by the Secretary of DOT. It does not require the imposition of goals or set-asides, unlawful or otherwise.

Therefore, the Court must look to the regulations promulgated under STURAA to determine whether Plaintiffs are likely to suffer a denial of equal protection. Plaintiffs do not attempt to distinguish the regulations here from the federal regulations discussed in *Cone*, nor could they. As was noted in *Cone*, the federal regulations expressly state that "[n]o person shall be ... discriminated against in connection with the award and performance of any contract covered by this Part, on the grounds of race, color, national origin, or sex." 49 C.F.R. § 23.7 (1990). The regulations also provide escape hatches by which unlawful discrimination may be avoided. First, the relevant department of DOT may approve an overall DBE participation goal of less than ten percent if the recipient of federal funds can justify a lower goal. 49 C.F.R. § 23.66(b) (1990); *see also Cone*, 921 F.2d at 1194. Second, each recipient of

federal funds is required to establish a challenge procedure by which third parties may challenge the disadvantaged status of any individual presumed to be disadvantaged. 49 C.F.R. § 23.69 (1990); *see also Cone,* 921 F.2d at 1194. Third, in appropriate circumstances a state may receive an exemption from the DBE program requirements or may be permitted to implement a program that deviates from the DBE program requirements set forth in the regulations. 49 C.F.R. § 23.41(f); *see also Cone,* 921 F.2d at 1194. Finally, a State DBE program enacted pursuant to STURAA is required to provide that a prime contractor who is unable to meet DBE goal requirements is still eligible to be awarded a contract if it demonstrates good faith efforts to meet the goal. 49 C.F.R. § 23.45(g)(ii).

Plaintiffs have failed to distinguish this case from *Cone* in any meaningful way. Accordingly, the Court holds that both Capeletti and Westwind lack standing to challenge the County's utilization of race-conscious measures pursuant to STURAA. This holding renders the question of the County's standing to assert its cross-claim against the State and federal defendants moot.

**B.** *Standing to Challenge the County Program.*

■ As the Court previously noted, the defendants do not challenge Westwind's standing to sue since Westwind was not awarded a contract on which it was the low bidder due to its non-compliance with the County Program. This, indeed, appears sufficient to confer standing on Westwind. *See, e.g., Cone,* 921 F.2d 1190 (11th Cir. 1991); *Underground Contractors Ass'n v. Metropolitan Water Reclamation Dist.,* 1991 WL 127616 (N.D.Ill.1991); *Capeletti Brothers, Inc. v. Broward County,* 738 F.Supp. 1415 (S.D.Fla.1990), *aff'd without opinion* 931 F.2d 903 (11th Cir.1991), *cert. denied* ——— U.S. ———, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991); *Main Line Paving Co. v. Board of Educ.,* 725 F.Supp. 1349 (E.D.Pa.1989). The Court will therefore address the question whether Capeletti has standing to challenge the County BBE Program.

1. The County Program's Requirements.

On July 20, 1982, the Dade County Commission enacted Ordinance 82–67, which established the County Program challenged by Plaintiffs. The Ordinance provides in relevant part that the County manager shall establish an administrative procedure for reviewing proposed County construction contracts to determine "whether the inclusion of race-conscious measures in the bid specifications will foster participation of qualified Black contractors and subcontractors in the contract work." Dade County Code § 10–38(d).

Permissible race-conscious measures include goals for Black participation and set-asides. *Id.* If the County manager determines that goals are desirable, the goals are to be based both on estimates of the quality and opportunity of subcontracting possibilities on a particular proposed contract and on estimates the availability and capability of Black contractors and subcontractors to do the work. *Id.* § 10–38(d)(1). The apparent low bidder on a County project utilizing goals must either meet the goal or demonstrate that he made every reasonable effort to do so but nonetheless failed to meet the goal. *Id.* The bid documents may also require that all bidders on a project demonstrate such reasonable efforts as part of their bid submission. The steps required to demonstrate such reasonable efforts are to be specified in the invitation for bids and the bid documents. *Id.* The Code does not set forth any guidance as to what might or might not constitute reasonable efforts.

A set-aside is the designation of a given purchase of services for competition solely among Black contractors. *Id.* § 10–38(d)(2). A set-aside may be utilized only where prior to an invitation for bids it is determined that there are enough Black contractors or subcontractors to afford effective competition for the purchase. A recommendation to utilize a set-aside must be submitted to the County Board of Commissioners for review. *Id.* The Board

must then review the recommendation to determine "whether waiver of competitive bidding for such contract is in the best interest of the County." *Id.*

Finally, the Code requires that the County manager file an annual report on the amount of County construction contracts awarded that year and the percentage of that amount awarded to Black contractors and subcontractors. *Id.* § 10–38(e). The Board must then determine "whether to continue in effect the administrative procedure for utilization of race-conscious measures authorized by this Ordinance." *Id.*

The Ordinance does not establish a protest procedure by which aggrieved parties may challenge a decision of the Board or the County manager. Nor does it set forth procedures for determining whether a particular enterprise can be certified as Black-owned and controlled.

The regulations promulgated under the Ordinance require each County department with funds budgeted to capital improvement projects to maintain records on the dollar value of all construction contracts anticipated as well as goals for Black participation in those projects each fiscal year. § 1.01. On each individual construction project, the department must also suggest what types of race-conscious measures, if any, should be utilized on the project in light of the number and types of Black-owned firms likely to be available to participate in the project. § 1.02. These suggestions are then forwarded to a three member Contract Review Committee. §§ 1.04; 2.01–.04. The Committee is required to review the suggestions and submit a recommendation to the Board of Commissioners as to the desirability and types of race-conscious measures to be used.

The regulations provide that goals shall be considered when the Committee's review indicates that they offer the greatest potential for Black subcontractor participation. § 4.01. Goals must relate to the potential availability of Black-owned firms in the required field of expertise and within Dade County. §§ 4.02–.03. Bidders are required to use good faith efforts to meet the goals, and the lack of such efforts renders a prime contractor's bid not responsive. §§ 4.04–.05. No guidelines are offered as to what constitutes good faith efforts.

Under the regulations, set-asides may only be considered if there are at least three certified Black prime contractors with the capability to perform the contract. § 5.01. If a set-aside is utilized, bid procedures limiting competitive bids to Black certified firms must be implemented. § 5.04.

Finally, the regulations state that all participants in the County Program will be certified as Black firms. § 3.01. The regulations require a firm to submit a form application, but do not provide for an initial hearing on whether a firm should be certified. A denial of certification can, however, be appealed to the Contract Review Committee. § 3.05. There is no provision permitting a third party to challenge a certification decision, nor for a third party to appeal the certification of a firm. Certification of all firms must be updated annually. § 3.06.

### 2. The Standing Determination.

Having reviewed the relevant provisions of the County Program, the Court must once again apply the test set forth in *Cone* to determine whether Capeletti has standing to challenge the County Program. The Court looks first for evidence of specific instances where the County has denied Capeletti or others equal protection through the operation of the County Program.

The evidence of past discrimination offered by Capeletti is slim. First, there is no evidence that Capeletti was denied a contract despite the fact that he was the low bidder. The evidence, indeed, is the same as that offered to support Capeletti's standing argument concerning STURAA. Joe Capeletti's declaration states that in two instances, Capeletti bid on projects funded solely by the County. In each case, Capeletti was awarded the contract after submitting a low bid and meeting goals established under the County Program. In each case, a subcontractor that Capeletti

hired to satisfy the Program requirements defaulted, resulting in higher costs to Capeletti that were not passed on to the County. The declaration asserts that on a yearly basis, Capeletti often incurs costs on contracts it receives from the County as a result of BBE goals. The Court has already explained why such allegations of "injury" are insufficient to demonstrate the likelihood of an equal protection violation at the hands of the County and hence why they cannot confer standing on Plaintiffs.

Although Capeletti has alleged no past discrimination against it by the County, there is evidence in the record that the County may have violated Westwind's right to equal protection by rejecting its bid even though it was the lowest bid submitted. Evidence offered by a plaintiff that a government official has injured someone other than the plaintiff is relevant to the determination of how an official is likely to treat the plaintiff in the future. *Cone*, 921 F.2d at 1205 n. 48. In this case, however, there has yet to be a determination that Westwind's equal protection rights were violated when it did not receive the contract on which it submitted the low bid. Further, there is no evidence indicating that it is anything more than a single, isolated incident in the operation of a statute that went into effect nearly a decade ago. *Cf. Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561, 570 (1976) (plaintiffs who sought injunction against an alleged policy of police brutality lacked standing based on "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of department disciplinary procedures"). This evidence is simply not sufficient to establish that the County Program is likely to produce a violation of Capeletti's equal protection rights.

In light of the paucity of evidence of past discrimination, the Court must look elsewhere to determine if a denial of equal protection to Capeletti is likely. The Ordinance itself does not require County officials to implement goals and set-asides which are not lawful remedial responses to

identified past or present racial discrimination in Dade County. *Cone*, 921 F.2d at 1207. Like STURAA, the Ordinance leaves the matter to the discretion of various County officials. The County manager is authorized to establish an administrative procedure to determine on a case-by-case basis whether the inclusion of race conscious measures in bid specifications will foster participation of qualified Black contractors and subcontractors.

The regulations promulgated under the Ordinance do not appear likely to produce a denial of equal protection to Capeletti either. *Cone*, 921 F.2d at 1207. The *Cone* court looked to two factors in determining whether the regulations were likely to cause an equal protection violation. The first was the existence of several "escape hatches" that allowed the administrators of the challenged program to avoid a violation of the fourteenth amendment. The second was the federal regulations' express requirement that state officials not discriminate unlawfully. *Cone*, 921 F.2d at 1209.

The County Program shares several of STURAA's "escape hatches." An aggrieved contractor can file an equal protection challenge in either state or federal court. Further, like the state DBE Program challenged in *Cone*, a prime contractor unable to meet a goal may still receive a contract if it demonstrates its good faith efforts to do so. This provision allows the County a significant opportunity to avoid denying a low bidder a contract in violation of the Equal Protection clause.

Nevertheless, unlike STURAA or the state program challenged in *Cone*, the County Program does not provide a procedure by which a contractor can file a third party challenge to the disadvantaged status of an individual seeking County construction work. The certification is, however, reviewable annually. Further, there does not appear to be a protest procedure applicable to the County Program by which a contractor can challenge the decision to include a set-aside or DBE goal in the contract specifications of a particular project.

The Ordinance and its accompanying regulations admittedly lack the clear prohibition against unlawful discrimination that the federal regulations promulgated under STURAA contain. Section 10–38(b) provides that "[e]xcept where federal or state law or regulations mandate to the contrary, the provisions of this Section shall be applicable to all construction contracts funded in whole or in part by county funds." The state regulations challenged in *Cone*, however, also lacked such a provision. The *Cone* Court apparently attached little significance to this fact, reasoning that a government official's oath of office performs the same function. *Cone*, 921 F.2d at 1209.

Therefore, although the question is not free from doubt, the Court nonetheless concludes that the facts established by the record do not demonstrate that Capeletti has standing to challenge the County Program. Nothing in the regulations suggests that the County is likely to deny Capeletti equal protection under the law. Admittedly the regulations do not completely foreclose the possibility of an equal protection violation, but the facts in the record do not demonstrate that such a violation is anything more than a hypothetical possibility. There can be no doubt that hypothetical or possible injuries are insufficient to confer standing. Further, there is no evidence that Capeletti itself was discriminated against in the awarding of public contracts. The only evidence that the Ordinance has worked a violation of the equal protection clause is the failure of the County to award a contract to Westwind on which it was the low bidder. One such denial over a period of nine years, without more, is insufficient to establish that the County is likely to deny equal protection to Capeletti in the awarding of construction contracts.

## CONCLUSION

Accordingly, it is hereby:

ORDERED AND ADJUDGED that Defendants' motions for summary judgment on Capeletti's and Westwind's challenges to STURAA are GRANTED.

ORDERED AND ADJUDGED that the motions for summary judgment on the County's cross-claims against the State and federal defendants are GRANTED.

ORDERED AND ADJUDGED that the County's motion for summary judgment on Capeletti's challenge to the County Program is GRANTED.

DONE AND ORDERED.