O'DONNELL CONSTRUCTION
COMPANY, Appellant,

v.

DISTRICT OF COLUMBIA, et al.

No. 91–7056.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 28, 1992.

Decided May 5, 1992.

As Amended May 10, 1992.

Wm. Bradford Reynolds, with whom Robert C. Smith, Washington, D.C., was on the brief, for appellant.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Office of the Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before: MIKVA, Chief Judge, RUTH BADER GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Separate concurring statement filed by Circuit Judge RUTH BADER GINSBURG.

RANDOLPH, Circuit Judge:

The Supreme Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), controls our disposition of this constitutional challenge to the District of Columbia Minority Contracting Act. The case comes to us on appeal from the district court's denial of a preliminary injunction. *O'Donnell Constr. Co. v. District of Columbia*, 762 F.Supp. 354 (D.D.C.1991). We hold that the O'Donnell Construction Company has made out a substantial case that the District is violating O'Donnell's Fifth Amendment right to equal protection of the laws and that the district court therefore should have enjoined the District, during the pendency of this suit, from enforcing the Act in a manner that deprives O'Donnell of the equal opportunity to compete for city road construction contracts.

## I

O'Donnell Construction Company, a Virginia corporation with its principal place of business in the District of Columbia, is a road construction firm, performing most of its work for government agencies in the Washington area. Founded in 1985, the company's stock is owned by Arnold J. and John A. O'Donnell, both of whom are white. More than three-fourths of O'Donnell's employees are members of a minority. Affidavit of Arnold J. O'Donnell at 2 (Sept. 20, 1989). O'Donnell sued the District in 1989 under 42 U.S.C. §§ 1981 and 1983, claiming that the District's use of racial classifications in awarding road construction contracts violated the equal protection component of the Fifth Amendment. The complaint challenged both the D.C. Minority Contracting Act and the District's federally-assisted Disadvantaged Business Enterprise Program. Only the Minority Contracting Act is before us in this appeal.

For fifteen years, the District of Columbia's awarding of construction con-

tracts has been governed by the Minority Contracting Act. The present version of the Act requires each District agency to "[a]llocate its construction contracts in order to reach the goal of 35 percent ... of the dollar volume of all construction contracts to be let to local minority business enterprises" or, as they are commonly called, MBEs. D.C.CODE ANN. § 1–1146(a)(1). District agencies must submit quarterly reports to the District's Minority Business Opportunity Commission setting forth the degree to which they have met the goal and an explanation of any failure to do so. D.C.CODE ANN. § 1–1146(a)(3)(D). The Commission has general authority to implement and enforce the Act. D.C.CODE ANN. § 1–1149.

In order to achieve the 35 percent figure in contracting agencies, the Commission—a seven-member body appointed by the Mayor—must establish, among its programs for assisting minority contractors, "a sheltered market approach to contracts." D.C.CODE ANN. § 1–1147(b). Each agency must implement the Commission's programs. D.C.CODE ANN. § 1–1146(a)(3)(A). In a sheltered market, agencies set aside contracts and subcontracts for "limited competition" in bidding among MBEs, to the exclusion of all others. Only MBEs certified by the Commission are permitted to participate in the sheltered markets. D.C.CODE ANN. § 1–1147(b). While non-minority firms are ineligible to compete in sheltered markets, MBEs are eligible to bid for both sheltered and non-sheltered contracts. The Act itself does not specify the precise portion of the District's contracts reserved for sheltered markets, but it does require each agency to allocate to the sheltered market a sufficient portion of its contracts to enable it to reach the 35 percent goal. D.C.CODE ANN. § 1–1149(3).

Under § 1–1147(c) of the Act, "[t]he prime contractor shall perform at least 50 percent of the contracting effort" and "if he subcontracts, 50 percent of the subcontracting effort" must go to MBEs. D.C.CODE ANN. § 1–1147(c) & (d).

The Act also confers upon the Commission several discretionary powers designed to increase MBE participation in District contracting. For example, in individual cases the Commission can waive bonding requirements or recommend subdividing contracts if "necessary to achieve the purposes of" the Act. D.C.CODE ANN. § 1–1149(6) & (7). The Commission is also required to monitor minority contracting problems and "make further recommendations that increase minority contractor's [*sic*] participation." D.C.CODE ANN. § 1–1149(10). O'Donnell does not appear to challenge these provisions.

The favored class of "local minority business enterprises," as defined in the current Act, are local firms—those with their principal place of business in the District—in which members of a minority own or control an interest greater than 50 percent. D.C.CODE ANN. § 1–1142(2) & (3). As it now reads, the Act defines "minority" to mean "Black Americans, Native Americans, Asian Americans, Pacific Islander Americans, and Hispanic Americans, who by virtue of being members of the foregoing groups, are economically and socially disadvantaged because of historical discrimination practiced against these groups by institutions within the United States of America." D.C.CODE ANN. § 1–1142(1). Earlier versions of the Act contained somewhat different definitions and had expressly included "Eskimos" and "Aleuts." *See* D.C. Law 3–91, § 2(a), 27 D.C. Reg. 3280; and D.C. Law 1–95, § 3(a), 23 D.C. Reg. 9532b. The present definition was enacted in 1983. The reasons for the change are uncertain. The District of Columbia Council made no findings regarding the purpose of the amendment or the need for it.

In the district court the parties disputed how much of the District's road construction contracts were let through the Act's sheltered market procedures. O'Donnell claimed that in 1987 and 1988, 100 percent of such contracts were reserved for the sheltered market. As a firm doing only road construction, O'Donnell maintained that the District thus entirely excluded it from bidding solely because of the race of its owners. The District disputed O'Donnell's figures, claiming they were too high. The District also argued, and the district

court agreed (762 F.Supp. at 365 n. 13), that the focus should not be on subsets of the industry such as road construction but on the construction industry as a whole. We need not speak to the matter. The district court made no findings about the percentage of road construction contracts set aside for MBEs and we do not believe the issue here turns on the outcome of this factual dispute.

## II

■ Three points deserve mention before we get directly to the constitutionality of the Minority Contracting Act. In the trial court, the District argued that O'Donnell lacked standing to seek a preliminary injunction. The district court was right in rejecting this challenge on the ground that the complaint, backed up by Arnold J. O'Donnell's affidavit, alleged that the company was ready, willing and able to perform road construction work let by the District and was suffering an injury because of the MBE program, which deprived the company of the opportunity to compete on an equal footing for the District's contracts. 762 F.Supp. at 362. The District has not pursued its standing argument in this appeal and there is no need for us to say anything more on the subject. *Cf. Cone Corp. v. Florida Dep't of Transp.*, 921 F.2d 1190 (11th Cir.1991).

■ The next point concerns *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), in which the Supreme Court sustained a minority set-aside program enacted by Congress and, in doing so, applied a more deferential standard of review than the strict scrutiny test used in *Croson.* The District had contended—but does not any longer—that *Fullilove*, rather than *Croson*, supplied the standard for reviewing the Minority Contracting Act. The district court put this argument to rest. 762 F.Supp. at 363 n. 11. *Fullilove* relied on Congress' remedial powers derived from section 5 of the Fourteenth Amendment. *Fullilove*, 448 U.S. at 483, 100 S.Ct. at 2777 (plurality opinion); *Croson*, 488 U.S. at 488, 109 S.Ct. at 718 (plurality opinion). The District of Columbia Council does not share

Congress' constitutional power. Congressional oversight of the District did not, and did not purport to, transform the Council's enactments into congressional legislation designed to enforce the Fourteenth Amendment. *Croson*, not *Fullilove*, controls.

The third point concerns the Minority Contracting Act's use of the term "goal" in referring to the 35 percent for MBEs. The Supreme Court in the *Croson* case referred to the City of Richmond's law as a "quota"; and the Court, in several passages, described the quota as a "rigid racial preference" or a "rigid line." 488 U.S. at 499, 508, 109 S.Ct. at 724, 728–29. The district court here placed no importance on this difference in terminology. Neither do we. *Cf. Contractors Ass'n of Eastern Pa., Inc. v. City of Phila.*, 945 F.2d 1260, 1270–71 (3d Cir.1991) (Higginbotham, J., concurring in the judgment). As originally drafted, the bill that ultimately became the D.C. Minority Contracting Act of 1977 used the term "requirement" in designating the percentage of the District's contracting business to go to MBEs. Report of the Employment and Economic Development Committee on the Minority Contracting Act of 1976, at 25–26 (Apr. 12, 1976) ("Report"). "Requirement" was changed to "goal," a committee report tells us, at the request of the District's executive branch in 1976, which cited its "good intentions." Report at 26–27. The committee made the change in order to "encourage and reinforce Council/Executive Branch rapport and togetherness in supporting the thrust of this legislation." *Id.* at 27. The committee also determined that there was "no real need ... to enforce stringent requirements upon the District agencies" so long as the Commission, responsible for enforcing the Act, was "very strong." *Id.*

As enacted, the percentage became far more than merely a hope, a wish or an aspiration. Section 1–1146(a)(1) contains the following command: "Each [contracting] agency of the District of Columbia ... *shall* ... [a]llocate its construction contracts in order to reach the goal of 35 percent...." D.C.CODE ANN. § 1–1146(a)(1) (emphasis added). In this legisla-

tive formulation, the label attached to the 35 percent figure is inconsequential. If any agency falls short of the "goal," the District's Minority Business Opportunity Commission "shall reserve" a sufficient portion of the agency's contracts to be awarded according to the Commission's programs, including the sheltered market, "so that such agency's failings shall be timely remedied." D.C.CODE ANN. § 1–1149(3). In other words, District agencies must achieve at least 35 percent. The Commission, by regulation, has ensured that no District agency will fail to do so. Each agency is required to place 35 percent "of the total dollar amount of construction contracts in the sheltered market." 27 D.C.M.R. § 602.3(a). The District's law is as rigid as Richmond's in still another respect. As the District states in its Brief (at 6), "the Act requires contractors not to subcontract more than half of their contracts (exclusive of the cost of materials) and to award at least half of any subcontracts to minority firms...." *See* D.C.CODE ANN. § 1–1147(c) & (d). We realize that the District's Commission has the authority to adjust these percentages. But the same was true in Richmond, where city officials were empowered to grant a "partial or complete waiver" of the quota. 488 U.S. at 478–79, 109 S.Ct. at 713–14. At any rate, it is apparent that the Act's 35 percent "goal" serves as a requirement, and that the means devised to satisfy the requirement are racial classifications.

This brings us to the constitutional question. Among other things, O'Donnell's entitlement to a preliminary injunction turned on whether it was likely to succeed on the merits of its claim. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). The district court ruled that O'Donnell had not demonstrated a likelihood of prevailing. 762 F.Supp. at 363–67. In this we think the court was mistaken.

■ *Croson* held that under the Equal Protection Clause of the Fourteenth Amendment, a local government may not use racial classifications to remedy past racial discrimination unless it can demonstrate a compelling interest for doing so. The Fifth Amendment makes the equal protection principles of the Fourteenth Amendment fully applicable to the D.C. Council's legislation. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). Those principles demand, at a minimum, that the District have a "strong basis in evidence" to support its racially-based program. *Croson*, 488 U.S. at 499–500, 109 S.Ct. at 724–25; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion). The District cannot simply rely on broad expressions of purpose or general allegations of historical or societal racism. Rather, its legislation must rest on evidence at least approaching a *prima facie* case of racial discrimination in the relevant industry. The District's response to the problems of the past—if these have been satisfactorily demonstrated—must also be narrowly tailored to achieve its end. *Croson*, 488 U.S. at 507–08, 109 S.Ct. at 728–29.

■ In 1977, when the Minority Contracting Act became law, minorities made up a majority (more than 70 percent) of the District of Columbia's population. Report at 2. In Richmond, minorities were not so dominant, making up 50 percent of the city's population, and holding five of the nine seats on the city council. 488 U.S. at 495, 109 S.Ct. at 721 (plurality opinion). Still, Justice O'Connor, joined by the Chief Justice and Justices White and Kennedy, expressed concern that the Richmond law might have been motivated by "simple racial politics," that the political majority in the community had acted to disadvantage those who were not of the same race, and had done so without careful attention to the actual facts. 488 U.S. at 493, 495–96, 109 S.Ct. at 720, 721–22. Although O'Donnell stresses this portion of Justice O'Connor's opinion (Brief at 11), we place no weight on it. The outcome in *Croson*, expressed in the portions of the opinion joined by a majority, did not turn on who possessed political power in Richmond. A fifth vote cannot be supplied by Justice

Scalia's separate opinion concurring only in the judgment. Justice Scalia did mention that the Richmond plan benefited the "dominant political group" in the city. 488 U.S. at 524, 109 S.Ct. at 737. But this was merely by way of illustration. On his view, the racial composition of the city ultimately turned out to be inconsequential. *Id.*

As to the factual predicate supporting the District's Minority Contracting Act, the Act itself declares, in a section entitled "Findings," that its purpose is to "overcome the effects of past discrimination in the allocation of contracts," D.C.CODE ANN. § 1–1141(6). Apart from the point that undocumented legislative declarations of remedial purposes count for naught, as *Croson* held, 488 U.S. at 500, 109 S.Ct. at 724, this "finding" naturally raises the question discrimination by whom? The record here, like the record in *Croson*, 488 U.S. at 480, 109 S.Ct. at 714, is devoid of any evidence that agencies of the District of Columbia had been favoring white contractors over non-whites, or that the typical bidding process was somehow rigged to have this effect. *Compare Associated General Contractors of Cal. v. Coalition for Economic Equity,* 950 F.2d 1401, 1414 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1670, 118 L.Ed.2d 390 (U.S.1992).

██ There is, in the same "Findings" section, the statement that "a persistent pattern of racial discrimination in our society has prevented minority business enterprises from gaining a fair share of contracts and subcontracts for construction, supplies, and materials in both the public and private sector." D.C.CODE ANN. § 1–1141(1). This observation about society-wide discrimination, regardless of its truth, cannot be relied upon to enact racial preferences. Otherwise, any race-conscious program, any set-asides for minority businesses, in any amount in any place for any length of time would be allowed. Yet one of the essential points of *Croson* is that the only basis on which such legislation may be sustained despite the principles of equal protection is as a remedy for past racial discrimination. Here, as elsewhere, the scope of that remedy must depend upon the scope of the violation. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775–76, 53 L.Ed.2d 851 (1977). A "generalized assertion" of discrimination in the construction industry as a whole, the Supreme Court held in *Croson,* therefore will not suffice. 488 U.S. at 498, 109 S.Ct. at 723. "While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Id.* at 504, 109 S.Ct. at 726. Pronouncements contained in legislation cannot satisfy this standard and so, like the district court, we will proceed to examine the other material the District offers in support of the Act.

The Council's Employment and Economic Development Committee (in conjunction with two other committees) held hearings and issued a report in 1976. The Committee's Report states that, according to "[i]nformal records" of the Washington Council for Equal Business Opportunity, approximately 300 minority-owned construction firms were in operation in 1974 in the Washington metropolitan area. Report at 8. The Committee did not specify what types of construction work these firms performed; the race of the owners of the firms; the total volume of business they handled; whether they were in the private or public contracting sector; whether they were fully employed; or whether any of them had been unable to get work as a result of racial discrimination. Instead, the Commission reported that "no agency in the area maintains, up-to-date, any detailed information on the status of all of these firms." *Id.*

The newly-formed Greater Washington Business Center provided the Committee with information on 82 of its minority contractor client firms for the 1974 calendar year. These 82 firms did $52,156,000 worth of business in 1974. Report at 8. The Report does not indicate how much of this was in the private sector; how much

consisted of public contracts let by the District, how much by the federal government, or how much by state and local governments in Maryland and Virginia; or whether any of these 82 firms had been subjected to racial discrimination, public or private. The Report does recite that since $1,091,000,000 was expended on all forms of construction in the Washington metropolitan area in 1974, these 82 firms accounted for approximately 5 percent of the total. Report at 8–9. This is mathematically correct but, under *Croson*, constitutionally meaningless.

The D.C. Department of General Services, the Report continues, spent $152,765,363 on construction in 1974, only $5,267,630 of which, or 3.4 percent, went to minority-owned firms. The Committee did not have figures for any other District agency. Report at 9. But it assumed "that their records do not greatly exceed the performance of the Department of General Services." *Id.* Comparing the 82 firms' $52,156,000 with the Department of General Services' $152,765,363 in construction expenditures for the same year, the Committee thought that "quite possibly, minority contractors had the capability to perform 34% of the contracts let." *Id.* In light of the "rule of thumb" that surety bond rating procedures generally permit construction firms to double previous year's production, the Committee believed that minority firms might have performed 68 percent of the contracts. From this the Committee inferred—not that there had been racial discrimination—but that "surely, there is no rationale for quibbling over the attainment of this [25 percent] goal." *Id.* at 10.

The district court concluded, incorrectly, that "[t]hese statistics demonstrated that MBEs were capable of performing at least 34% of the District's construction work, but that only 3.4% of such work had actually been awarded to them." 762 F.Supp. at 365. The statistics did not deal with "the District's construction work." The numbers related only to the construction contracts let by one agency in one year. The Committee did not purport to determine whether the 82 firms were qualified or available to perform any of that agency's

$152,765,363 in construction contracts, many of which appear to have been for large scale building projects such as schools and detention facilities.

We do not in any event understand the basis for the district court's further conclusion that "these statistics indicat[e] a continuing practice of discrimination in the local construction industry." 762 F.Supp. at 365. From our reading of the Report, the statistics were not marshalled for the purpose of making any such demonstration; they were used instead in order to show that the 25 percent goal of minority participation in the District's construction contracts, the figure contained in the original Act, could be attained. Even for that very different purpose the Committee's analysis is quite flawed. But by no means do the Committee's figures show—as they must under *Croson*—"any identified discrimination in the [District of Columbia] construction industry." 488 U.S. at 505, 109 S.Ct. at 727. The same document from which the Committee derived its 3.4 percent figure regarding construction contracts let by the Department of General Services reveals that the agency awarded to minority firms 32.4 percent of repairs and improvements contracts; 32.2 percent of its architectural contracts; and 24.5 percent of its material management contracts. These other figures cast doubt on the notion that the 3.4 percent figure resulted from agency discrimination. The idea that discrimination caused the low percentage is nothing more than a hypothesis (and one not expressly adopted by the Committee). It is not a finding of fact and could not be on this record. The hypothesis was never tested. There are many other possible explanations for the 3.4 percent figure. Minority firms may not have bid on the Department of General Services construction contracts because they were generally small companies incapable of taking on large projects; or they may have been fully occupied on other projects; or the District's contracts may not have been as lucrative as others available in the Washington metropolitan area; or they may not have had the expertise needed to perform the contracts; or they may have bid but were rejected because others came in with a lower price.

One might of course suppose that minority firms lacked expertise or were small in size or numbers because of racial discrimination in the past. In another portion of the Report, the Committee stated: "The current level of minority contracting participation, which is, unquestionably, the legacy of past practices and events which have prevented full participation of minorities in the business world, is grossly insufficient for a city in which more than 72 percent of the population are minority persons." Report at 2. But we have already discussed why, under *Croson*, generalized assertions about societal discrimination are an inadequate basis for the sort of race-conscious measures at issue here. Comparisons between the percentage of a city's minority population and the percentage of contracts awarded to MBEs are irrelevant under *Croson*, 488 U.S. at 501–02, 109 S.Ct. at 725–26: "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." It is true that in addition to statistical information, the Committee received testimony from several witnesses attesting to problems they faced as minority contractors. Much of the testimony related to bonding requirements and other structural impediments any firm would have to overcome, no matter what the race of its owners. *See Croson*, 488 U.S. at 498–99, 109 S.Ct. at 723–24. The more specific testimony about discrimination by white firms could not in itself support an industry-wide remedy. As the Ninth Circuit has observed, "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination." *Coral Constr. Co. v. King County*, 941 F.2d 910, 919 (9th Cir.1991). Anecdotal evidence is most useful as a supplement to strong statistical evidence—which the Council did not produce in this case.

In short, there is no "strong basis in evidence" for the use of a 35 percent goal, enforced through sheltered markets and subcontracting set asides. As we have said, the percentage is not linked to any racial discrimination in the District construction industry in general, or in the road construction industry in which O'Donnell seeks to participate. It "cannot in any realistic sense be tied to any injury suffered by anyone." *Croson*, 488 U.S. at 499, 109 S.Ct. at 724. If there has been an injury in those industries, the District has never identified it with any precision and it is therefore impossible to assess whether the sheltered market approach is a remedy "narrowly tailored to remedy prior discrimination." *Id.* at 507, 109 S.Ct. at 728.

Thus far we have focused, as did the district court, on evidence presented in the mid–1970's, when the Act first became law. But what is before us is the 1983 version of the Act. The 1983 Act imposes a goal of 35 percent, not the 25 percent figure contained in the 1977 legislation. The District concedes that no findings whatever were made when the Council increased the percentage. Raising the "goal" by ten percentage points without any attempt to link the new racial preference to any identified discrimination was simply arbitrary. Since the District has not even tried to identify the discrimination it sought to remedy in the 1983 Act, it has demonstrated no interest compelling enough to survive strict scrutiny under the Constitution. *Croson*, 488 U.S. at 505, 109 S.Ct. at 727. The District also concedes that the Council has never made any findings with respect to discrimination in the construction industry against Hispanic Americans, Asian Americans, Pacific Islander Americans, or Native Americans, all of whom are included in the Act's current definition of "minority." These circumstances raise constitutional problems of their own. For one, the "random inclusion of racial groups" for which there is no evidence of past discrimination in the construction industry raises doubts about the remedial nature of the Act's program. *Croson*, 488 U.S. at 506, 109 S.Ct. at 727. For another, there is no way of saying whether the remedy the Council has chosen is narrowly tailored to provide remedial relief for the amalgam of minority groups covered by the Act.

Using the data compiled in the mid–1970's to support the current legislation presents another difficulty. A 1980 amend-

ment to the Act limited participation in the sheltered markets to *"local* [minority] business enterprises." D.C. Law 3–91, §§ 2(c), 4(g) (emphasis added); *see also* D.C. Law 4–167, § 2(c) & (d). Like the plan in *Croson*, the original Act contained no geographic limitations on the MBEs eligible for preferential treatment. The two documents the Employment and Economic Development Committee cited in its Report included a large percentage of out-of-District firms. Of the 82 firms about which the Greater Washington Business Center provided information, at least 30 were not based in the District. In the other document, in which the Washington Council for Equal Business Opportunity identified approximately 300 minority-owned firms doing business in the Washington area in 1974, at least one-third were based outside the District. Most of these minority firms were in Maryland and Virginia. Under the current version of the Act, there is some question whether these firms would qualify. The Act now provides that "preference shall be given to those minority businesses with principal offices located in the District of Columbia." D.C.CODE ANN. § 1–1149(2). Firms that are not "local business enterprises"—those whose principal office is physically outside the District—still may be certified to participate in the sheltered markets, but to do so they must convince the Commission that they are sufficiently "local." D.C.CODE ANN. § 1–1149(13). The Act requires the Commission to take into account whether the firm's principal place of business is in the Washington metropolitan area, how many of its owners and employees reside in the District, the location of the firm's assets, and the percentage of the firm's revenues attributable to the District. D.C.CODE ANN. § 1–1149(13)(A). Because of this later, limiting amendment, the original findings are now overbroad. The information provided to the Committee during its hearings in 1976 reveals nothing about which of the out-of-District firms had substantial assets in the District, or about any other of the current qualifications for certification.

One final point is worth noting. Although the District's original legislation was to expire in three years (Richmond's was to last five, 488 U.S. at 478, 109 S.Ct. at 713), the Council reenacted the law in 1980 and deleted the sunset provision. Fifteen years have now passed since the District put its minority contracting program into effect. The District has not suggested that an end is in sight. The Supreme Court in *Croson* warned that if "amorphous" claims of past discrimination were sufficient, racial preferences of any "duration" could be justified. 488 U.S. at 499, 505, 109 S.Ct. at 724, 727. So here. The District has no way of measuring when the wrong will be righted because it has not identified the wrong with any degree of specificity.

■ In sum, O'Donnell has made a strong showing that it is likely to prevail in its equal protection challenge to the Minority Contracting Act. This is the first requirement for the granting of a preliminary injunction. The three other factors are whether O'Donnell will suffer irreparable injury if the injunction is not granted, whether other parties interested in the proceedings will be substantially harmed, and the public interest. *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam). The district court thought these considerations were against O'Donnell but its analysis rested mainly on its view that O'Donnell was not likely to succeed on the merits. 762 F.Supp. at 369–70. Our view, guided by *Croson*, is different. As to irreparable injury, O'Donnell has little hope of obtaining "adequate compensatory or other corrective relief at a later date" if the injunction does not issue. *Virginia Petroleum Jobbers*, 259 F.2d at 925. In order to recoup its losses, O'Donnell would have to show which prime contracts and subcontracts it would have received in the absence of the sheltered markets and 50 percent set-aside provisions and how much profit it would have made on each of those contracts. The difficulty of such an inherently speculative showing weighs heavily in favor of granting the injunction, especially since O'Donnell's likelihood of success is so high. *Id.; see also General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir.1984). In this respect, O'Donnell is much like an unsuccessful bidder for a government contract who is seeking judi-

cial review because the contract was awarded to another under illegal procedures. *See Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). In that context, courts do not determine who should have obtained the disputed contract. Rather, agencies are routinely enjoined to redo the bidding process, in order to vindicate the disappointed bidder's right to a legally valid procurement process. *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 206–07 (D.C.Cir.1984); *see, e.g., Abel Converting, Inc. v. United States*, 679 F.Supp. 1133, 1142 (D.D.C.1988); *United Power Corp. v. U.S. Defense Mapping Agency*, 736 F.Supp. 354 (D.D.C.1990). Because damages cannot adequately compensate for the loss of that right, relief must be equitable. *National Maritime Union of America v. Commander, MSC*, 824 F.2d 1228, 1236–38 (D.C.Cir.1987). Here, O'Donnell asks only for prospective enforcement of that right. A forward-looking injunction would not upset any contractual relations already in place, thus minimizing the adverse impact on third parties. For this reason, the balance of hardships also cuts in favor of granting the injunction. Given the high probability of O'Donnell's eventual success in this litigation, interested third parties will eventually experience the effects of dismantling the Act. Similarly, issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications. The precise terms of the preliminary injunction are another matter. We recognize that the District will need to make major adjustments in its letting of contracts for which O'Donnell might compete. This consideration and others that traditionally enter into the discretionary determination of the terms of equitable relief we leave to the district court.

Therefore, the district court's denial of O'Donnell's motion for preliminary injunctive relief is reversed. *Cf. Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir.1986). The district court shall, consistent with this opinion, enter a preliminary injunction pending final judgment in this case.

*So ordered.*

RUTH BADER GINSBURG, Circuit Judge, concurring:

The pathmarking *Croson* decision instructs that where, as here, race classification is resorted to for remedial purposes, measures must be narrowly focused and supported by a strong factual predicate. As Judge Randolph's opinion ably demonstrates, the Minority Contracting Act falls short on both counts, and I therefore concur in the panel opinion. I do so with the understanding, made clear by *Croson*, that minority preference programs are not *per se* offensive to equal protection principles, nor need they be confined solely to the redress of state-sponsored discrimination. *See generally Associated General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1413–18 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Further, in his separate opinion in *Croson*, Justice Stevens reasoned, and I agree, that remedy for past wrong is not the exclusive basis upon which racial classification may be justified. *See Croson*, 488 U.S. at 511, 109 S.Ct. at 730.