O'DONNELL CONSTRUCTION
CO., Plaintiff,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 89–1867.

United States District Court,
District of Columbia.

Dec. 22, 1992.

William Ward Nooter, Jordan, Coyne, Savits & Lopata, Benjamin Jay Blustein, Office of Corp. Counsel, District of Columbia, Washington, DC, for Marion S. Barry, Jr., and District of Columbia.

Robert Carl Smith, Washington, DC, Michael John Wilson, Breed, Abbott & Morgan, Richard Landfield, Washington, DC, for O'Donnell Const. Co.

## MEMORANDUM

JOHN GARRETT PENN, Chief Judge.

This matter is before the Court on Cross–Motions for Summary Judgment. This Court must determine the constitutionality of the District of Columbia's efforts to improve the opportunities for minority entrepreneurs to participate in city contracting.

Plaintiff O'Donnell Construction Company ("O'Donnell") has filed the instant lawsuit seeking declaratory and injunctive relief declaring as unconstitutional two set-aside programs, namely the District of Columbia Minority Contracting Act (hereinafter the "Act"), D.C.Code section 1–1141 *et seq.* (1981), and the Department of Public Works' ("DPW") Disadvantaged Business Enterprise ("DBE") Program [1], that govern defendant District of Columbia's procedures for awarding construction contracts. O'Donnell also claims that these programs violate its civil rights under 42 U.S.C. section 1981 [2] and 42 U.S.C. section 1983.[3]

---

1. *See* Complaint, Exhibit A.

2. 42 U.S.C. section 1981 provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white persons...."

3. 42 U.S.C. section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

By Memorandum Order filed March 14, 1991, the Court denied O'Donnell's motion for a preliminary injunction. *See O'Donnell Construction Co. v. District of Columbia, et al.,* 762 F.Supp. 354 (D.D.C.1991), *rev'd,* 295 U.S.App.D.C. 317, 963 F.2d 420 (1992). After careful consideration of the motions, the oppositions thereto, and the voluminous record in this case, the Court concludes that plaintiff's motion should be granted and that defendants' motion should be denied for the reasons set forth below.

## I. Background

O'Donnell is a Virginia corporation with its principal place of business in the District of Columbia. Arnold J. and John O'Donnell each own 50% of the company's stock. They are white males. The company, which was founded in 1985, is engaged in the road construction business in the Washington metropolitan area. According to Arnold J. O'Donnell, the majority of the firm's work is performed for government agencies, rather than the private sector. *See* Affidavit of Arnold J. O'Donnell, paras. 2–5. The company, however, has bid on only one DPW road construction contract in the last four fiscal years. *See* Affidavit of Jerry M. Carter dated February 7, 1991 at para. 7.

## II. The Statutory and Regulatory Scheme [4]

### A. District of Columbia Minority Contracting Act

#### 1. Set–Aside Program

The District of Columbia Minority Contracting Act was enacted in March, 1977. The Act establishes goals for the participation of minority business enterprises (hereinafter "MBE") in the awarding of public construction contracts. As stated in the Act's findings, one of its goals is "to achieve the goal of equal opportunity, to overcome the effects of past discrimination in the allocation of contracts, and the financing and bonding of minority business enterprises."

D.C.Code section 1–1141(6). Among the stated reasons for the Act is the fact that "[a] persistent pattern of racial discrimination in our society has prevented minority business enterprises from gaining a fair share of contracts and subcontracts for construction, supplies, and materials in both the public and private sector ..." Section 1–1141(1). Additionally, the Act states that "[t]he inability of [MBEs] to prosper and participate fully is particularly unacceptable in the District of Columbia, where there is a great disparity between the number of [MBEs] operating in the community and the number of such enterprises participating in public contracting ..." Section 1–1141(2).

The Act provides that each agency, department, office, or instrumentality of the District of Columbia government shall "[a]llocate its construction contracts in order to reach the goal of 35 percent ... of the dollar volume of all construction contracts to be let to local [MBEs] ..." *Id.* at sections 1–1142(6), 1–1146(a)(1).[5] The Act defines MBE as "a business enterprise of which more than 50 percent of the ownership and control is held by individuals who are members of a minority, and of which more than 50 percent of the net profit or loss accrues to members of a minority." *Id.* at 1–1142(2). Further, under the Act, "the term 'minority' means Black Americans, Native Americans, Asian Americans, Pacific Islander Americans, and Hispanic Americans, who by virtue of being members of the foregoing groups, are economically and socially disadvantaged because of historical discrimination practiced against these groups by institutions within the United States of America." *Id.* at 1–1142(1). Additionally, a "local" MBE is defined as a MBE "with its principal office physically located in the District of Columbia, and which is licensed pursuant to [section] 47–2801 et seq. or subject to the tax levied under [section] 47–1810.1 et seq." Section 1–1142(3). Finally, section 1–1148(a) of the Act requires

---

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..."

**4.** The following discussion of the statutory and regulatory scheme in this case is borrowed for

the most part from this Court's earlier Memorandum Order. *See id.*

**5.** The Act as originally passed in 1976 established a goal of 25%. The 1983 amendment to the Act set the present goal of 35%.

that all firms participating in the program be issued a certificate of registration.

The Act also created a Minority Business Opportunity Commission ("Commission") to help implement, monitor and enforce its goals. Among other things, the Commission is responsible for determining whether firms desiring to take advantage of the Act are bona fide MBEs or joint ventures and are eligible for certification; determining, pursuant to applicable regulations, whether a MBE without a principal office physically located in the District of Columbia is nevertheless a local business enterprise; reviewing agency procurement plans; considering agency requests for adjustment of goals in particular instances; and authorizing agencies to refuse to let a contract where it determines that the bids are excessive. Sections 1-1149(2), (4), (8), 1-1149(13). In order to achieve the purposes of the Act, the Commission may also recommend that an agency waive bonding in excess of the standard waiver, make advance payments to a certified contractor, or subdivide a contract into smaller parts. Section 1-1149(6), (7). Finally, the Commission is required to submit a report to the Mayor and the Council every 6 months reviewing the performance of agencies in meeting the established goals. Section 1-1145.

The Commission is also required under the Act to design programs to assist local minority contractors. Among these programs is the "sheltered market", defined as a "process whereby contracts or subcontracts are designated, before solicitation of bids, for limited competition from [MBEs] on either a negotiated or competitive bid process." Sections 1-1142(7), 1-1147(b). Further, all prime contractors who subcontract are required to award at least 50% of their subcontracts to certified MBEs. Section 1-1147(c), (d). This requirement, however, may be waived by the contracting official, with the Commission's approval and consent. *Id.*

### 2. Legislative History

As Law I-95, the Act was first introduced in the District of Columbia City Council and assigned Bill No. 1-323, which was referred to the Committee on Employment and Economic Development (hereinafter the "Committee"). The Bill was adopted on first and second readings on September 15, 1976 and on October 12, 1976 respectively. It was signed by the Mayor on November 15, 1976 after which it was assigned Act No. 1-174 and transmitted to both Houses of Congress for its review. After the 30 day review period, it became law. *See* D.C.Code section 1-1141 (reference to legislative history of Law I-95).

The Committee, chaired by Councilmember James E. Coates, held joint public hearings on May 28-29, 1975 with the Committee on Government Operations and the Committee on Public Services and Consumer Affairs. During the hearings, the Committee received detailed testimony and voluminous data from governmental and industrial representatives, including Committee members and staff, federal agencies, finance and bonding industries, minority organizations, minority contractors, and non-minority and large contracting firm representatives.[6] In 1976, the Committee prepared a 53-page report which discussed all aspects of the proposed legislation and recommended its enactment (hereinafter the "Report"). *See* Defendants' Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, Exhibit 1. The Committee's legislative findings of racial discrimination in the construction industry are summarized below.

First, the Committee relied on several varieties of statistical evidence. It noted a wide disparity between the District's minority population of seventy-six percent and the percentage of minority participation in public contracting with the District. *See* Report at 8. Moreover, statistical comparisons were made by the Committee between minority capability and minority participation in the local construction industry. The Report points out that in 1974, 82 Washington, D.C. area MBEs had generated revenues of $52 million and thus were capable of performing 34% of the District's construction work,

---

6. For excerpts of the hearing testimony, see Defendants' Opposition to Plaintiff's Application for a Preliminary Injunction, Exhibits 1–4.

which totalled $153 million. The Report further demonstrates, in reliance on surety bond rating procedures, that MBEs possessed a capability to perform $102 million worth of construction work, or 68.3% of the construction contracts let. On the other hand, only 3.4% of the District's construction work had actually been awarded to minority firms. *Id.* at 8–10. Similar statistics were provided with respect to service, supply, and architectural contracts. *Id.* at 11–12.

Second, the Committee cited a Congressional report in support of the MBE program. Specifically, in House Report 94–468, the chairman of the Subcommittee on SBA Oversight and Minority Enterprise expressed the view that effective remedial action was needed to guarantee equal economic opportunity for those who have traditionally encountered impediments to their business development because of discrimination. *Id.* at 36.

Third, at the legislative hearings a number of minority contractors offered testimony concerning discrimination in the local construction industry. Among the issues brought to the attention of the Committee were discriminatory practices by non-minority firms in the award of subcontracts to minority firms, discriminatory practices by lending institutions towards minorities, the discriminatory effects of bonding requirements and attempts by non-minority firms to evade existing affirmative action programs. The witnesses provided numerous specific examples to the Committee of these facts.

For example, Milton G. Carey, president of Mars General Corporation, a minority general contracting firm, testified at the hearings concerning specific incidents he had personally experienced in which major white contractors had been able to avoid their obligations under existing affirmative action programs by imposing unreasonable demands on minority subcontractors such as him, and then obtaining waivers of the affirmative action requirements. These companies could then obtain lower bids from non-minority subcontractors, only later to raise the price through change orders. *See* Def.'s Opp., Ex. 1, pp. 16–18.

Similarly, in the statement of Frank C. Kent, Executive Director of the Minority Contractors Resource Center, Inc., there was a lengthy discussion of the difficulties minority firms faced getting non-minority firms to hire them for Metro work until they were forced to meet specific affirmative action requirements. Even then, non-minority firms tried to circumvent the requirements by setting up phony minority companies. *Id.* at 72–77. Additional testimony of a similar nature was related in the statement of Joseph D. Jackson, Director of the Washington Council for Equal Business Opportunity. *See* Def.'s Opp., Ex. 3, p. 9.

Discrimination by lending institutions against minority firms was reported by Joe Willis of Alpha Omega Construction Company, a minority firm. *Id.* at 25–28. Mr. Douglas Edwards, of E & S Hauling, Inc., also spoke about the disparate treatment he received from non-minority firms in the bidding process. According to Mr. Edwards, non-minority general contractors usually required that his firm submit a written quotation and, subsequently, he is not allowed an opportunity to negotiate the price. By contrast, these same general contractors permit non-minority subcontractors to phone in their bid and allow them to negotiate the price afterward. *Id.* at 40–41.

The special problems minority firms face with respect to bonding requirements were described at some length by Mitchell Hairston, of District Builders Incorporated. Mr. Hairston pointed out that he had been told by bond companies that black contractors are a high risk. *See* Def.'s Opp., Ex. 1, p. 59. Similar problems facing a minority street paving company were testified to by Carl Jones of Jones & Artis Construction Co. *See* Def.'s Opp., Ex. 3, p. 20. Finally, Charles Cassell, Executive Director of the D.C. Council of Black Architects, articulated with great specificity the plight of the minority contractor in this jurisdiction as a result of the pervading influence of discrimination. *See* Def.'s Opp., Ex. 4, pp. 37–40.

In addition to testimony regarding discrimination in the local construction industry, the Committee heard testimony concerning other impediments facing minority contrac-

tors. These include difficulty in obtaining financing, difficulty in obtaining bonding, difficulty in bidding on large parcels, difficulty in receiving timely bid announcements, difficulty in receiving timely payment, difficulty in maintaining start-up capital for new projects, difficulty in securing meaningful equity positions in joint ventures and difficulty in obtaining contracts from the District of Columbia. *See* Report at 14–16.

### B. *Disadvantaged Business Enterprise Program*

■ In 1983, Congress enacted a quadrennial transportation authorization act entitled the Surface Transportation Assistance Act of 1982, Pub.L. No. 97–424, 96 Stat. 2097, 2100. The 1982 Act requires that each recipient of federal aid make reasonable efforts to award at least 10% of these funds to disadvantaged firms, that is, small firms owned and controlled by socially and economically disadvantaged individuals. The Department of Transportation promulgated detailed regulations implementing this section. 48 Fed.Reg. 33432 *et seq.*, codified at 49 C.F.R. part 23, subpart D (1986). The subsequent authorization act, the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), contained a similar provision. Pub.L. 100–17, section 106(c), 101 Stat. 132, 145. STURAA contained language essentially identical to the 1982 Act in that it also established a 10% goal for expenditures with disadvantaged businesses. In 1987, the Department of Transportation promulgated amendments to the regulations required by

STURAA. 52 Fed.Reg. 39225–31. The current regulations are codified at 49 C.F.R. part 23 (1990).[7]

■ As a condition of receiving federal funding of state highway construction projects, the District must comply with federal rules regarding contracting generally, and regarding STURAA in particular. States may certify as DBEs only those businesses that meet the eligibility standards in 49 C.F.R. section 23.62. Under 49 C.F.R. section 23.62, a firm is disadvantaged if it is a small business concern and is owned and controlled by individuals who are socially and economically disadvantaged. STURAA incorporated the definitions of social[8] and economic[9] disadvantage of section 8 of the Small Business Act, 15 U.S.C. section 637(d), and the regulations promulgated pursuant to it. States are directed to make a rebuttable presumption that women and members of specified racial and ethnic minority groups[10] are socially and economically disadvantaged and to determine on a case-by-case basis whether individuals who are not members of those groups are socially and economically disadvantaged. Also, as part of its certification procedure, the state must provide a procedure through which third parties may challenge the certification of individuals presumed to be socially and economically disadvantaged. 49 C.F.R. section 23.69.

Recipients of federal highway assistance must set overall goals for participation by DBEs that are "practical and related to the availability of [DBEs] in desired areas of

---

7. In *Milwaukee County Pavers Assoc. v. Fiedler*, 731 F.Supp. 1395 (W.D.Wis.1990), *aff'd*, 922 F.2d 419 (7th Cir.1991), Chief Judge Crabb cogently summarized the regulations implementing STURAA. The following discussion of these regulations is extracted therefrom.

8. According to the regulations, social disadvantage "must stem from [an individual's] color; national origin; gender; physical handicap; long term residence in an environment isolated from the mainstream of American society; or other similar cause beyond the individual's control." 49 C.F.R. section 23, Appendix C, sections (A)–(B). Furthermore, the individual must show a personal experience of social disadvantage that is long-standing and has negatively influenced his or her advancement in business. *Id.*

9. Economic disadvantage is a secondary determination that may be made only after social disadvantage has been determined. 49 C.F.R. section 23, Appendix C, sections (A)–(B). The regulations state that "[a]s a general rule, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged."

10. A minority group member is a Black, Hispanic, American Indian, Eskimo, Aleut, Native Hawaiian, Asian–American, or Asian–Pacific. The exact parameters of these racial and ethnic categories are defined at 49 C.F.R. section 23.62.

expertise." 49 C.F.R. section 23.45(g). Any overall goal of less than 10% must be justified with information concerning, among other things, the recipient's efforts to locate disadvantaged businesses, the recipient's efforts to make disadvantaged businesses aware of contracting opportunities, the availability of disadvantaged businesses, the size and other characteristics of the minority population in the recipient's jurisdiction, and legal or other barriers impeding the participation of disadvantaged businesses at a 10% level and the recipient's efforts to overcome or mitigate the effects of these barriers. 49 C.F.R. section 23.65.

One way that a state may achieve its overall goal is by setting individual goals for disadvantaged business subcontractor participation on each prime contract. 49 C.F.R. section 23.45(g)(2)(ii). Like the overall disadvantaged business participation goals, specific project goals must be "practical and related to the availability of [disadvantaged businesses] in desired areas of expertise." 49 C.F.R. section 23.45(g)(1). Specific project goals must be based on "known availability of qualified [DBEs]." 49 C.F.R. section 23.-45(g)(7).

For all contracts on which disadvantaged business subcontractor participation goals have been established, the apparently successful prime contractor must submit information about the participation of disadvantaged firms before the state commits itself to the performance by the prime contractor. 49 C.F.R. section 23.45(h)(1). If the level of disadvantaged business participation does not meet the contract goals, the state may grant a waiver of the goals to the prime contractor if the state is satisfied that the prime contractor has made good faith efforts to meet the goals. 49 C.F.R. section 23.-45(h)(2). Each state has discretion to consider whether, under all relevant circumstances, the contractor has "actively and aggressively" attempted to meet the goal. 49 C.F.R. section 23.45, Appendix A, at 176. The federal government has provided a non-exclusive, non-exhaustive list of the kind of efforts that states may consider. See 49 C.F.R. section 23.45, Appendix A. It is "not intended to be a mandatory checklist." Id.

Pursuant to STURAA, in 1988 the District enacted the Department of Public Works ("DPW") Disadvantaged Business Program ("DBE"). The DBE program was approved by the Federal Highway Administration on November 29, 1988. DPW is primarily responsible for administering the program. Firms wishing to participate in this program must apply for certification as a DBE under the provisions set forth in the federal regulations.

Since 1988, DPW has set an overall goal of awarding 37% of federally-funded contracts to DBEs. With respect to individual contract goals, DPW has set a goal of 37% of the total dollar volume for DBE participation where the prime contract has subcontracting possibilities. In addition, the District has enacted the Sheltered Market option provided for in C.F.R. section 23.45(k).

### III. Motion for Summary Judgment

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment, has the burden of proving the lack of any genuine issue of fact, the Court must view the available facts in the light most favorable to the non-moving party. *Minihan v. American Pharmaceutical Ass'n*, 812 F.2d 726, 727 (D.C.Cir.1987).

Although the burden on the party opposing a motion for summary judgment is

not great, the party is still "required to show specific facts as opposed to general allegations, that present a genuine issue worthy of trial." 10A Wright, Miller & Kane, Federal Practice & Procedure at 2727 (2d ed. 1983). Under this standard, facts asserted by the party opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true. *Id.*

### A. *District of Columbia Minority Contracting Act*

#### 1. Mootness

■ As a preliminary matter, the Court must determine whether the issue of the constitutionality of the District of Columbia Minority Contracting Act is moot in light of the fact that the District has passed the Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Temporary Act of 1992 ("Temporary Act").

The District contends that the issue of the constitutionality of the Act is now moot. The District argues that the enactment of the Temporary Act fully supplants the Act.

On the other hand, plaintiff contends that the constitutionality of the MBE program is not moot merely because of the passage of the Temporary Act. Plaintiff asserts that the District still has the power to reenact the challenged statute, and thus, this Court must address the issue of the constitutionality of the District's MBE program.

In *Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the question of mootness was raised by the revision of the ordinance while the case was pending. The Supreme Court held that the revision of the ordinance did not make the issue moot. The Supreme Court stated that "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.... [T]he city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."

*Id.* at 289, 102 S.Ct. at 1074–75. *See also National Advertising Co. v. Ft. Lauderdale*, 934 F.2d 283 (11th Cir.1991).

Thus, this Court must conclude that the issue of the constitutionality of the Minority Contracting Act has not been rendered moot by the passage of the Temporary Act.

#### 2. Merits

■ In its challenge, O'Donnell contends that the Act does not serve a compelling government interest, and even if it does, it is not narrowly tailored on its face or in practice. The District, on the other hand, asserts that the legislative history underlying the Act amply demonstrates that the purpose of the Act was to address past discrimination against MBEs, and that the program is narrowly tailored to achieve that goal.

Recently, in *O'Donnell Construction Company v. District of Columbia, et al.*, 295 U.S.App.D.C. 317, 963 F.2d 420 (1992), the United States Court of Appeals for the District of Columbia Circuit held that O'Donnell was entitled to a preliminary injunction enjoining the District from enforcing the Act in a manner that deprives O'Donnell of the equal opportunity to compete for city road construction contracts.[11] While the Court of Appeals did not purport to address the merits of the pending action, the Court of Appeals has provided this Court with strong guidance on how to proceed.

In *O'Donnell*, the court stated, "that the Act's 35 percent 'goal' serves as a requirement, and that the means devised to satisfy the requirement are racial classifications." 295 U.S.App.D.C. at 321, 963 F.2d at 424. The court went on to conclude "... there is 'no strong basis in evidence' for the use of a 35 percent goal, ... [because] the percentage is not linked to any racial discrimination in the District construction industry in general, or in the road construction industry in which O'Donnell seeks to participate." 295 U.S.App.D.C. at 327, 963 F.2d at 427. The court reasoned that the Act is constitutionally infirmed because the Act relies on general

---

11. This Court entered the preliminary injunction on June 18, 1992. *See* Order, June 18, 1992. Further, the Court has granted two (2) motions by the District to modify the preliminary injunc-

tion to allow the District to proceed with certain contract solicitations. Neither of these two motions were opposed by plaintiff. *See* Orders, August 11, 1992 and October 13, 1992.

allegations of discrimination in the construction industry, the Act contains geographic limitations that are overbroad on the present record and the Act is unlimited in duration.

*Croson* makes it clear that at a minimum, the District must have a "strong basis in evidence" to support its racially-based program. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 499–500, 109 S.Ct. 706, 724–25, 102 L.Ed.2d 854 (1989). The District cannot simply rely on broad expressions of purpose or general allegations of historical or societal racism. Rather, as the Court of Appeals noted, "its legislation must rest on evidence at least approaching a *prima facie* case of racial discrimination in the relevant industry ... [and] must also be narrowly tailored to achieve its end." *O'Donnell,* 295 U.S.App. D.C. at 321, 963 F.2d at 424.

Thus, the court concluded that the record is devoid of any evidence that agencies of the District of Columbia had been favoring white contractors over non-whites, or that the typical bidding process was somehow rigged to have this effect. *Id.* 295 U.S.App.D.C. at 322, 963 F.2d at 425. Nevertheless, while the City Council's Employment and Economic Development Committee (the "Committee") issued a Report filled with statistics detailing the difference between the ability of MBEs to perform construction work and the amount actually awarded, the court concluded that "by no means do the Committee's figures show—as they must under *Croson*— 'any identified discrimination in the District of Columbia construction industry.'" *Id,* 295 U.S.App.D.C. at 323, 963 F.2d at 426 (citations omitted).

The original Act contained no geographic limitations on the MBEs eligible for preferential treatment. However, the Act as reenacted provides that "preference shall be given to those minority businesses with principal offices located in the District of Columbia." D.C.Code Ann. § 1–1149(2); *see also* D.C.Code Ann. §§ 1–1149(13) and 1–1149(13)(A). The Court of Appeals found that because of the limiting amendment that "the original findings are now overbroad." 295 U.S.App.D.C. at 325, 963 F.2d at 428.

Finally, the Act as reenacted by the District in 1980 deleted the sunset provision.

The Supreme Court in *Croson* warned that if "amorphous" claims of past discrimination were sufficient, racial preferences of any "duration" could be justified. *Croson,* 488 U.S. at 499, 505, 109 S.Ct. at 724, 727. As the Court of Appeals noted, The District has not suggested that an end is in sight ... [and] [t]he District has no way of measuring when the wrong will be righted because it has not identified the wrong with any degree of specificity." *O'Donnell,* 295 U.S.App.D.C. at 325, 963 F.2d at 428.

Using the guidelines provided by the Court of Appeals, this Court notes that nothing has changed in the record that would lead this Court to conclude that the Act can pass constitutional muster. Therefore, this Court concludes that for the reasons stated above the District of Columbia Minority Contracting Act is unconstitutional. Thus, the District is permanently enjoined from enforcing the Act as it is presently authorized. However, this does not prohibit the District from implementing a new version of the Minority Contracting Act as long as it is in conformity with the teachings of the Supreme Court.

### B. *Disadvantaged Business Enterprise Program*

With respect to the Department of Public Works' Disadvantaged Business Enterprise Program, O'Donnell does not challenge the federal statute, its implementing regulations, or the District's decision to apply for these highway construction funds. Instead, O'Donnell argues that the set-aside program, as implemented by the District, is not narrowly tailored. Specifically, O'Donnell contends that the District's DBE program, on its face and in practice, far exceeds the race-conscious remedial relief mandated by Congress under STURAA in the form of a 10% set-aside for disadvantaged business enterprises. O'Donnell asserts that there is no independent basis—i.e. evidence of past discrimination—to justify the significantly higher 37% figure established by the District's DBE program.

As a preliminary matter, the District has unconvincingly argued that the DBE pro-

gram is not race-based because the classification is defined as "disadvantaged" rather than "minority." While DBEs do not necessarily have to be minority owned, the regulations provide various racial and ethnic groups with a presumption of social and economic disadvantage. Anyone who is not a member of these groups must prove that s/he is actually socially and economically disadvantaged. In *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 421–22 (7th Cir.1991), the Seventh Circuit held that for the purposes of equal protection analysis the racial presumption in STURAA is in itself a form of racial discrimination. This Court agrees.

In ruling on the preliminary injunction, this Court did not resolve the issue of whether the 37% figure is outside the bounds of federal authority under STURAA since it appeared to the Court that the legislative findings of discrimination in the local construction industry which were analyzed in connection with the Minority Contracting Act may also justify a 37% set-aside goal for federally funded construction projects.

■ O'Donnell argues that the Court should apply *Croson* to the percentage above 10% of road construction contracts that the District awards as set-asides. However, not STURAA itself, nor the federal regulations, nor *Fullilove*, nor *Croson* requires the District as a recipient of federal funds to conduct any inquiry to determine the existence of prior discrimination in the District construction industry in implementing STURAA. Rather, federal regulations direct the District to follow a number of steps to determine an appropriate goal. *See Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419 (7th Cir.1991); *Tennessee Asphalt Co. v. Farris*, 942 F.2d 969 (6th Cir.1991); *Ellis v. Skinner*, 753 F.Supp. 329 (D.Utah 1990); and *Harrison & Burrowes Bridge Constructors Inc. v. Cuomo*, 743 F.Supp. 977 (N.D.N.Y. 1990).

The District, on the other hand, contends that it has followed those steps and received federal approval through the United States Department of Transportation ("USDOT") of the 37% set-aside goal pursuant to 49 C.F.R. sections 23.64(d) and 23.66(a) and thus the District's DBE program is merely the implementation of the federal program.

O'Donnell's argument is similar to those raised by the plaintiffs in *Milwaukee County Pavers Ass'n v. Fiedler*, 731 F.Supp. 1395 (W.D.Wis.1990), *aff'd*, 922 F.2d 419 (7th Cir. 1991). *Milwaukee County Pavers* also involved a constitutional challenge to a state DBE program implemented pursuant to STURAA. The Wisconsin DBE program established a set-aside goal of not less than 10%, and in practice the actual expenditure amounted to 13.1% to 15.7% in various years. As in the instant case, plaintiffs therein conceded the constitutionality of the federal act but argued that Wisconsin's implementation of the program was unconstitutional. First, they argued that the program was not narrowly tailored because the state had not made findings of past discrimination in Wisconsin. Second, they argued that the state's administration of its DBE program exceeded its authority under STURAA.

The district court rejected plaintiffs' initial argument, and held that it would be inconsistent with *Fullilove* to require states to make findings of prior discrimination to ensure that their implementation of the federal statute is narrowly tailored. *Id.* at 1409–1410. The Seventh Circuit affirmed this ruling, and further explained that under the authority of the Fourteenth Amendment, Congress can "engage in affirmative action with a freer hand than states and municipalities. And one way it can do that is by authorizing states to do things that they could not do without federal authorization. That was *Fullilove*; it is this case as well." 922 F.2d at 424.

The *Milwaukee County Pavers* district court also found Wisconsin's use of the program to be outside the bounds of federal authority in three aspects and thus unconstitutional in those areas, namely: "(1) in setting goals for disadvantaged business subcontractor participation in projects funded exclusively by the state, (2) in requiring disadvantaged business prime contractors to make good faith efforts to use disadvantaged business subcontractors, and (3) in extending the Wisconsin program past the date for which the [federal] program is authorized."

731 F.Supp. at 1399. In so holding, the district court stated: "The constitutionality of the state's program depends on its character as an implementation of the federal program. To the extent that the state steps beyond the boundaries of this federal authority, it is acting on its own authority and must base its action on specific findings of identifiable discrimination." *Id.* at 1414.

This principle is not inconsistent with *Fullilove.* Although the federal statute at issue in *Fullilove* was held to be constitutional on its face, the Supreme Court noted that "questions of specific application must await future cases." *Fullilove v. Klutznick,* 448 U.S. 448, 486, 100 S.Ct. 2758, 2779, 65 L.Ed.2d 902 (1980). The question to be decided in this case is whether the District's set-aside goal of 37% exceeds its authority under the federal statute and, if so, whether this goal is supported by specific findings of identifiable discrimination such that the program is nevertheless narrowly tailored.

Under STURAA, recipients of federal funds must set an overall goal of 10% or more for participation by DBEs. Where a state seeks to impose an overall goal of less than 10%, the regulations specifically set forth the necessary information which must be supplied to justify such a request. *See* 49 C.F.R. section 23.65. The regulations also clearly contemplate that recipients may set a goal larger than the 10% minimum,[12] so long as the figure is "practical and related to the availability of DBEs in desired areas of expertise." 49 C.F.R. section 23.45(g).

As a recipient of federal highway aid, each year the DPW must and does, pursuant to the federal requirements, submit to the USDOT a goal for that year's expenditures with disadvantaged businesses in federally assisted highway contracts. It appears to the Court that the District has submitted the DBE plan annually and that it has repeatedly been approved by the USDOT.

■ Where, as in this case, the District's program is enacted to implement federal legislation imposing specified requirements on the District and the legislation is an integral part of the federal-District legislative framework, the District program should be considered a subsidiary element of the federal legislation. However, such a relationship does not divest this Court of its responsibility to determine whether the District has exceeded its authority in implementing STURAA.

■ The mere fact that the USDOT has consistently approved the District's DBE plan does not make such approval a Congressional finding of discrimination in the construction area. Rather, it appears to the Court that the USDOT's approval is pro forma and that the USDOT does not undertake any type of independent investigation to determine whether the District's implementation of the 37% set-aside is related to actual and identifiable discrimination in the construction industry in the District of Columbia.

The contested District statute is intended to improve the District's implementation of the federal program. Pursuant to 49 C.F.R. section 23.45(g)(3)(i): Recipients shall submit their overall goals and a description of the methodology used in establishing them with their [DBE] program. . . ." Thus, it appears to the Court that the District's submission of its DBE program is based upon the findings that are the underpinings of the Minority Contracting Act.

■ Based upon the earlier discussion of the constitutionality of the Minority Contracting Act, *supra* at 480–81, this Court cannot but conclude that the 37% figure is outside the bounds of federal authority under STURAA since it appears that the legislative findings of discrimination in the local construction industry are insufficient. Thus, as the foregoing discussion shows, the contested District statute is the subsidiary of a federal program and is not supported by adequate findings of past discrimination and therefore is not narrowly tailored, the Court has no choice but to conclude that the District has exceeded its authority in implementing STURAA.

12. 49 C.F.R. section 23.66 **Approval and Disapproval of Overall Goals** provides in relevant part: "The Administrator reviews and approves any

overall goal of ten percent or more submitted by a recipient as provided in § 23.45(g) of this part."

Thus, the Court must conclude that the District's Disadvantaged Business Enterprise Program is unconstitutional to the extent that the DBE program's 37% set-aside is based upon the factual predicate discussed herein. Therefore, the District must refrain from enforcing its DBE program in a manner that deprives O'Donnell of the equal opportunity to compete for city road construction contracts. However, the District is not prohibited from awarding road construction contracts in conformity with the 10% DBE set-aside established under STURAA.

An appropriate Order accompanies this Memorandum.

### ORDER

For the reasons discussed in the accompanying Memorandum, the Court concludes that plaintiff's motion for summary judgment should be granted, and that defendants' motion for summary judgment should be denied.

Accordingly, it is hereby

ORDERED that plaintiff's motion for summary judgment is granted; and it is further

ORDERED that defendants' motion for summary judgment is denied; and it is further

ORDERED that the District of Columbia Minority Contracting Act is held unconstitutional; and it is further

ORDERED that the District of Columbia is prohibited from enforcing the Disadvantaged Business Enterprise Program to the extent that it relies on the 37% set-aside; and it is further

ORDERED that this case is dismissed; and it is further

ORDERED that all other pending motions, if any, are denied.